446

John W. WITTEN

v.

A.H. SMITH & COMPANY, et al.

Civ. A. No. M–82–3198.

United States District Court,
D. Maryland.

Jan. 3, 1984.

Beverly Stone, Greenbelt, Md., Frederic R. Kellogg, Washington, D.C., and William D. Patkus, Falls Church, Va., for plaintiff.

Stephen D. Shawe, Bruce S. Harrison, J. Michael McGuire, and Shawe & Rosenthal, Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The plaintiff, John W. Witten, filed this putative class action alleging unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and 42 U.S.C. § 1985(3). (Paper No. 1). The plaintiff alleges that the defendants, A.H. Smith and Company, A.H. Smith Sand & Gravel Co., Davis Sand & Gravel Corp., A.H. Smith, Sr., and A.H. Smith, Jr., discriminated against him and others similarly situated on the basis of race in the setting and payment of salaries, benefits, and in other terms and conditions of employment. The plaintiff alleges that he was employed by A.H. Smith & Co., a Maryland corporation owned by A.H. Smith, Sr. (Paper No. 1, ¶ 3(e)), and that he performed his duties at A.H. Smith Sand & Gravel Co. and Davis Sand & Gravel Corp. (*Id.*, ¶ 9(a)). A.H. Smith, Jr. is alleged to be an employee of A.H. Smith & Co., and chief of operations for A.H. Smith Sand & Gravel Co. and Davis Sand & Gravel Corp.

On May 31, 1983, the plaintiff filed a request for the production of documents directed to A.H. Smith & Co., Davis Sand & Gravel Corp., and A.H. Smith Sand & Gravel Co. (Paper No. 12). On August 18, 1983, "A.H. Smith (hereafter 'Defendant' or 'the Company')" (Paper No. 20, at 1) responded to the plaintiff's request for production of documents. (Paper No. 20). The defendant Davis Sand & Gravel Corp. also filed its response. (Paper No. 21). On September 6, 1983, the plaintiff, being dissatisfied with the responses, filed a Motion to Compel in connection with his request for production

of documents. (Paper No. 24). Thereafter, counsel complied with Local Rule 34, and subsequently, the defendants filed an opposition relating to the two unresolved issues: (1) the geographic scope over which the plaintiff may compel discovery, and (2) whether the plaintiff is entitled to discovery of the defendants' affirmative action plan materials. (Paper No. 29).

### I. *Geographic Limitations on Discovery*

In cases in which discrimination is alleged on both an individual and a class wide basis, the permitted discovery must be sufficiently broad in scope to provide the plaintiff the opportunity to obtain the necessary evidence to satisfy the requirements of Rule 23 and, if a genuine class exists under that rule, to prove the allegations of class wide discrimination, *General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Doctor v. Seaboard Coast Line R. Co.,* 540 F.2d 699, 707 (4th Cir.1976). Nevertheless, the scope of discovery must not be so broad that it becomes overly burdensome, irrelevant, or an invasion of privileged matters, *National Organization for Women v. Sperry Rand,* 88 F.R.D. 272, 277 (D.Conn.1980). While a claim of employment discrimination will invariably require a broad investigation, "[i]t is an abuse of F.R.Civ.P. 23 to make unsupported charges of class wide discrimination in the hope that broad scale discovery may turn up some evidence to support the charges." *Cutner v. Atlantic Richfield Co.,* 16 F.E.P. 743, 744 (E.D.Pa.1977). Accordingly, discovery is subject to reasonable limitations imposed by the trial court in its discretion, *Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir.1983); *Sperry Rand,* 88 F.R.D. at 277, after balancing the needs and rights of both plaintiffs and defendants.

Geographic limitations have been imposed by the courts in class employment discrimination cases when the plaintiff seeks discovery from every facility operated by the defendant. *See, e.g., Falcon v. General Telephone Co.,* 626 F.2d 369, 376 (5th Cir.1980), *rev'd on other grounds,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (discovery

limited by the district court to only one division approved by the Fifth Circuit which added that manageability of the class was an appropriate factor to consider); *Sperry Rand,* 88 F.R.D. at 278 & n. 8 (discovery limited to three Sperry Rand facilities, the one where the plaintiff was employed, and two facilities to which the plaintiff had requested transfers); *McCray v. Standard Oil Co.,* 76 F.R.D. 490, 500 (N.D.Ill.1977) (scope of investigation limited to policies and practices emanating from Standard's Chicago headquarters where the plaintiff was employed); *Canty v. Phillip Morris U.S.A.,* 18 F.E.P. 86, 87–88 (E.D.Pa. 1978) (recognizing that the policies of each division may be different so as to defeat a nationwide class and, therefore, the court only certified a class of two regions whose personnel activities were centered in the same office, but required nationwide statistics be provided by the defendants); *Cutner,* 16 F.E.P. at 743 (plaintiff's discovery requests on a national scale denied); *Hinton v. Entex Inc.,* 93 F.R.D. 336 (E.D.Tex. 1981) (discovery limited to one facility when plaintiff made no specific allegations pertaining to any other facility of the defendant and the local facility was responsible for most employment decisions); *Joslin Dry Goods Co. v. EEOC,* 483 F.2d 178, 183–84 (10th Cir.1973) (discovery limited only to Joslin's downtown Denver store where the record before the court was adequate to permit an inference that each Joslin store was a separate employing unit); *McClain v. Mack Trucks, Inc.,* 85 F.R.D. 53, 62–63 (E.D. Pa.1979) (answers to interrogatories restricted geographically to Mack's Allentown facility where its four American manufacturing and assembly plants were operated independently of each other with regard to management, personnel, employment records, hiring, promoting, discharging and other employment practices).

The plaintiff alleges in his complaint that he applied for a position with A.H. Smith & Co., and was hired at A.H. Smith & Co. (Paper Nos. 1 & 17 ¶ 9(a)). He further alleges that he performed his duties at Davis Sand & Gravel Corporation in Clinton, Md. and at A.H. Smith Sand & Gravel Co.

in Brandywine, Md. (*Id.;* Paper No. 24 at 2; Paper No. 29, Witten Deposition at 74). In his deposition, he states that he was paid by Davis Sand & Gravel Corp. (*id.* at 123), was hired and fired by an A.H. Smith & Company official in Brandywine, (*id.* at 130), and that Mr. Wheeler Green, Safety Director, EEO Officer & Minority Business Enterprises Officer for A.H. Smith, testified at EEOC proceedings that the payroll departments of A.H. Smith and Davis Sand & Gravel Corp. are under the supervision of the same person. (*Id.* 212–13). He further testified at deposition that he had no knowledge as to who set the wage and benefit policies for A.H. Smith & Co., or how they were set. (*Id.* at 214–16).

In their opposition to the Motion to Compel, the defendants contend that A.H. Smith is a sole proprietor who owns a number of varied interests, including various road construction operations and businesses involved in the production and sale of building construction materials. The defendants further state that there are no entities or companies known as A.H. Smith Sand & Gravel Co. or A.H. Smith & Co. (Paper No. 29 at 2–3). The defendants assert that the plaintiff was employed by Davis Sand & Gravel Co. in Clinton, Md., but that he also worked at the Brandywine, Md. facility of A.H. Smith. (*Id.* at 3). The defendants state that these entities, the Brandywine and the Clinton facilities, are completely separate entities and that Mr. Gessner supervises the Davis Sand & Gravel Corp. while Mr. Critchley supervises the Brandywine division. Each supervisor, the defendants contend, controls the terms and conditions of employment, such as hiring, firing, rates of pay and fringe benefits, at the respective facility he supervises. (*Id.* at 4). Each A.H. Smith facility is allegedly supervised independently and has its own personnel policies. (*Id.* at 4–5 & n. 4). While the defendants have agreed to provide the documents requested by the plaintiff with regard to the Brandywine and the Clinton facilities, they contend that the information requested for any other A.H. Smith facility is irrelevant and should not be produced.

In light of the defendants' agreement to produce documents regarding employment

practices at the Brandywine and Clinton sand and gravel facilities, the court need not address that discovery limitation, although in light of the plaintiff's employment at each facility in the sand and gravel areas, discovery at each facility would be proper. Although the contentions made by the defendants with regard to the structure of the entities owned and/or operated by A.H. Smith, Sr. might, if proven, support a limitation of discovery, there is nothing in the evidentiary record which permits this court to conclude that the contentions made by the defendants in this regard are correct. Consequently, the court is unable to determine at this time the proper scope of discovery in this case. Accordingly, the defendants are permitted fifteen (15) days from this date to supplement the record to supply evidentiary facts, in documentary or affidavit form, in support of their assertions. A ruling on this portion of the Motion to Compel will be held in abeyance until that date. If the record is not so supplemented within that time, the Motion to Compel will be granted with regard to this first issue.

As this motion reveals, the identity of the proper defendants in this case is also unclear.[1] Therefore, the July 1, 1983 Order of this court permitting the plaintiff to file his interrogatories and requests for admissions two weeks after receiving all documents requested from the defendants is vacated, and the plaintiff is instructed to file so much of those papers as relate to the identity of the proper defendants within the time set forth in this Order.

## II. *Affirmative Actions Plans-Document Request Nos. 13 & 14*

The plaintiff asserts that any sensitive information contained in the affirmative action plans or EEO–1 reports of the defendants can be adequately protected with a Protective Order limiting the use of such information to this litigation.

The defendants assert that the "overwhelming weight of authority" holds that affirmative action plans and EEO–1 reports are not discoverable in racial discrimination employment cases by the individual plaintiff, because the plans and reports are not relevant or they constitute confidential, privileged information. (Paper No. 29, at 13).

There is no question that the objective factual information contained in the affirmative action plans of the defendants and in the EEO–1 reports may themselves contain relevant information or may lead to the discovery of admissible evidence. The question is whether the *evaluative* portions of those plans and reports are privileged.

The defendants seek to assert what has become known as the "critical self analysis" privilege. *Resnick v. American Dental Association,* 95 F.R.D. 372, 374 (N.D.Ill.1982). This privilege, as applied to reports made by a defendant corporation to strengthen compliance with Title VII and Executive Order 11246, was originally recognized in *Banks v. Lockheed-Georgia Co.,* 53 F.R.D. 283, 284–85 (N.D.Ga.1971). In *Banks,* Judge O'Kelley noted that a similar exclusion of critical evaluations had been approved in *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.1970). In that case, the court held that the plaintiff in a malpractice suit was not entitled to discovery of the minutes and reports of a hospital committee of physicians which reviewed and analyzed the individual physician's treatment and care of the patients in the hospi-

---

1. The plaintiff alleges in his complaint that he worked for A.H. Smith Sand & Gravel Co. and Davis Sand & Gravel Corp., both entities allegedly part of A.H. Smith & Co. (Paper No. 1, ¶ 3(e)). The defendants, however, assert that there is no such entity as the A.H. Smith Sand & Gravel Co. or the A.H. Smith & Co. (Paper No. 29). Even this assertion of the defendants is unclear in light of the fact that in Paper No. 20, Defendant A.H. Smith's Response to Plaintiff's Request for Production of Documents, the defendant responding to the document production request is identified as "Defendant, A.H. Smith (hereafter 'Defendant' or 'the Company')", (Paper No. 20, at 1) leaving the court and the plaintiff to guess whether the party responding is one of the individuals, A.H. Smith, Sr. or A.H. Smith Jr., or is, in fact, a company called A.H. Smith.

tal. The court there concluded that confidentiality was essential to assure that candid and conscientious evaluations of a doctor's care given within the hospital continue and to assure the public that adequate hospital care was provided. In *Banks,* Judge O'Kelley similarly concluded that the withholding of the reports allegedly containing critical evaluations of the defendant corporations equal opportunity efforts would likewise strengthen overall equal employment opportunity policy, whereas providing access to the plaintiff to the candid reports would discourage the frank self-criticism and evaluation necessary for encouraging compliance with the law. *See also Johnson v. Southern Railway Co.,* 25 FEP Cases 714 (N.D.Ga.1977); *Parker v. Kroeger Co.,* 25 FEP Cases 104 (N.D.Ga.1977); *Lee v. Keebler Co.,* 25 FEP Cases 758 (N.D.Ga.1977).

Other district courts have also concluded that the subjective portions of affirmative actions plans and EEO–1 reports are generally not discoverable by an individual plaintiff in a discrimination suit. *Jamison v. Storer Broadcasting Co.,* 511 F.Supp. 1286, 1296–97 (E.D.Mi.1981); *NOW v. Sperry Rand,* 88 F.R.D. 272, 279 (D.Conn.1980); *Roberts v. National Detroit Corp.,* 87 F.R.D. 30, 31–32 (E.D.Mi.1980); *McClain v. Mack Trucks, Inc.,* 85 F.R.D. 53 (E.D.Pa.1979); *Sanday v. Carnegie-Mellon University,* 12 FEP Cases 101 (W.D.Pa.1976); *Dickerson v. United States Steel Corp.,* 14 FEP Cases 1448 (E.D.Pa.1976).

Judge Newcomer distilled the basic reasoning in favor of this privilege and, despite the lack of any demonstration that voluntary compliance would be adversely affected by disclosure, concluded that the public policy arguments were persuasive and justified the privilege as applied to affirmative action plans. He wrote as follows:

"United States Steel resisted the plaintiffs' motion to compel production of documents primarily on the basis of a public policy argument. It argued that voluntary compliance on the part of employers is a necessary element of federal equal employment opportunity policy. Even though affirmative action plans are re-

quired for all government contractors, the quality of these documents depends to a great extent on the good faith of employers in evaluating their progress and establishing affirmative action goals. If these materials are subject to discovery and can be used by plaintiffs in Title VII suits, employers will not make candid evaluations and will attempt to set goals at minimum levels. Since the government cannot review in detail the massive amount of documents received under the affirmative action program, a decrease in voluntary cooperation could seriously impair the equal employment opportunity policy. . . .

Disclosure of such subjective information could discourage employers from making the candid internal evaluations that the affirmative action program envisions. Although the plaintiffs have argued persuasively that the defendant has not adequately demonstrated that disclosure would discourage voluntary compliance, the defendant's public policy argument nevertheless retains sufficient force to prevent disclosure."

*Dickerson,* 14 FEP Cases at 1449.

Other courts have concluded that the affirmative action plans of the defendant corporation should be produced, although a protective order should be entered limiting discovery of those plans to parties to the action or those necessarily involved with that action. *Zahorik v. Cornell University,* 98 F.R.D. 27, 32–33 (N.D.N.Y.1983); *EEOC v. ISO Financial Corp.,* 16 FEP Cases 174, 179 (W.D.Mo.1977). In *ISC Financial Corp.,* the court reached the conclusion to compel discovery without discussion of the public policy argument advanced in the cases recognizing this privilege. In *Zahorik,* the court recognized the split in the courts in connection with this privilege in an employment discrimination case context but concluded that, in light of the bitter discovery disputes in the litigation before it, discovery would be allowed.

Courts, which have recognized and applied this "critical self analysis" privilege to affirmative action plans and EEO–1 re-

ports, have identified four standards necessary for its application:

"(1) materials protected have generally been those prepared for mandatory governmental reports; (2) only subjective, evaluative materials have been protected; (3) objective data in those same reports have not been protected; and (4) in sensitivity to plaintiffs' need for such materials courts have denied discovery only where the policy favoring exclusion has clearly outweighed plaintiffs' need."

*O'Connor v. Chrysler Corp.,* 86 F.R.D. 211, 217 (D.Mass.1980). *See Webb v. Westinghouse Electric Corp.,* 81 F.R.D. 431, 434 (E.D.Pa.1978).

Judge Keeton in *O'Connor,* 86 F.R.D. at 217–18, grappled with the underlying question of whether the policy of equal employment opportunity would be better served by confidentiality of critical self-evaluation or by disclosure of material which might be most strongly probative of discriminatory intent in an individual case. The shortcomings of the basis for such a privilege were highlighted as follows:

"There is reason to believe that subjecting the evaluative conclusions contained in AAPs to discovery would not necessarily greatly deter future self-evaluations or substantially reduce their thoroughness. First, since the evaluations in these cases were not entirely voluntary, they will occur even if the threat of discovery is present. Second, in some cases there may be significant deterrents to candid self-evaluation, even absent the possibility of discovery. For example, sanctions against employees are often a possibility when self-evaluative investigations are undertaken. An employee's interest in protecting himself and his fellow employees from discipline is likely to be at least as great as his interest in protecting his employer from suit. Thus, the additional deterrence of investigation occasioned by the possibility of discovery may be minute."

*O'Connor,* 86 F.R.D. at 217. After recognizing these difficulties, however, Judge Keeton concluded that a lack of confidentiality would almost certainly result in some cramping of the investigative process. Therefore, although recognizing the difficulties of an *in camera* inspection of the withheld portions of the affirmative action plans by the court in a non-jury case, he ordered the production of the affirmative action plans with the subjective portions deleted but with *in camera* inspection of selected samples of the withheld portions. *Accord Brown v. Ford Motor,* 19 EPD ¶ 8969 (N.D.Ga.1978); *Dickerson,* 14 FEP Cases 1448. *But see Roberts,* 87 F.R.D. at 32 (subjective portions ordered withheld but the court declined to conduct an *in camera* inspection).

■ Exclusionary rules and privileges contravene the fundamental principle that "the public . . . has a right to every man's evidence." *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). As such, they must be accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting). *See Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

■ The Federal Rules of Evidence acknowledge the authority of the federal courts to continue the evolution and development of privileges of the common law as they may be needed in light of reason and experience. Fed.R.Evid. 501. Indeed, the enactment of Rule 501, and not the proposed Rules which identified specific privileges, was an expression of affirmative intent by Congress not to freeze the law of privilege. "Its purpose rather was to 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis,' 120 Cong.Rec. 40891 (1974) (statement of Rep. Hungate, and to leave the door open to change. See also S.Rep. No. 93–1277, p. 11 (1974); H.R.Rep. No. 93–650, p. 8

(1973)." *Trammel,* 445 U.S. at 47, 100 S.Ct. at 911.

Wigmore, a leading commentator on the law of evidence, has specified four fundamental conditions necessary to establish a privilege against disclosure of communications.

"First, the communication must have been made with the understanding that it would not be disclosed. Second, the element of confidentiality must be essential to the full and satisfactory maintenance of the relationship between the parties. Third, the relationship must be one which in the opinion of the community ought to be sedulously fostered. Fourth, the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit that would result from requiring the disclosure. Wigmore, Evidence § 2285, p. 527."

*EEOC v. University of Notre Dame,* 29 FEP Cases 1711, 1714 (1982).

An assertion of the "critical self analysis" privilege to justify the withholding of affirmative action plans and EEO–1 reports falls short of meeting the four conditions outlined by Wigmore. First, there is no showing that the communications in question, the affirmative action program plans or EEO–1 reports, were made with the understanding that they would not be disclosed. Indeed, the federal procurement regulations which require the filing of these reports state that the information obtained in those reports "shall be used only in connection with the administration of the Order [Executive Order 11246], the administration of the Civil Rights Act of 1964, and in furtherance of the Order and that Act." 41 CFR § 1–12.811 (1983). *See* 41 CFR §§ 1–12.805–5(c), 1–12.805–9(d) (1983); *see also Reynolds Metals Co. v. Rumsfeld,* 564 F.2d 663, 667 (4th Cir.1977) (regulations give notice that the information may be disclosed to the EEOC). Since the regulations themselves point out that the information in these reports may be used for effec-

tuating the purposes embodied in part by Title VII of the Civil Rights Act of 1964, there is little merit to an assertion by the defendants that these reports should remain confidential and precluded from use in a Title VII suit. Nor is there any basis for an asserted reliance on a uniform recognition of this privilege by the courts. *Compare O'Connor,* 86 F.R.D. 211 *with Zahorik,* 98 F.R.D. 27. Furthermore, in light of the number of recent suits challenging specific affirmative action plans, an expectation of confidentiality is not prudent.[2]

Second, there is a substantial question as to whether maintenance of the confidentiality of these reports is essential to a full and satisfactory continuance of the relationship between the defendant corporation and the federal government. While it is clear that the voluntary compliance of corporations contracting with the federal government would presumably and logically aid in the enforcement of the goal of providing an equal employment opportunity for all, it has not been demonstrated that disclosure would significantly discourage the amount of voluntary compliance presently being provided by defendant corporations in their dealings with the federal government. *O'Connor,* 86 F.R.D. 211; *Dickerson,* 14 FEP Cases at 1449. Unlike other courts which have considered this lack of proof and yet concluded that the privilege was warranted, this court acknowledges that, while the actual decrease in compliance would be difficult to demonstrate, there are indications that the quality of the reports presently made to the government would not suffer from disclosure. The plans and reports are not voluntary. In order to obtain a contract with the federal government, where the applicant contractor has more than 50 employees and seeks a contract worth in excess of $50,000.00, the applicant contractor *must* develop a written affirmative action compliance program for each of its establishments, and file its EEO–1 reports. 41 CFR §§ 1–12.810; 1–

---

**2.** *See, e.g., United Steel Workers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Osborne v. Cleland,* 620 F.2d 195 (8th Cir.1980).

12.805–4 (1983). Regardless of whether this privilege is recognized, and unlike the potential loss of the peer review meetings and reports present in *Bredice,* these reports in question in this case will continue to be demanded of all entities wishing to contract for the federal government.

As Judge Keeton in *O'Connor* suggests, there are reasons to believe that deterrents to candid self-evaluation by the defendant corporation in its reports already exist. He noted, as one example, a case where an individual employee, in the interest of protecting himself and his fellow employees from discipline, would conceivably be less candid in preparation of the reports. Other factors present in every case provide incentives for an applicant corporation to set affirmative action plan goals at a minimum level.

Compliance reviews of the contracting corporations are regularly required and conducted by the contracting agency. These compliance reviews determine whether a contractor or subcontractor maintains non-discriminatory hiring and employment practices and whether it is "taking affirmative action to ensure that applicants are employed and that employees are placed, trained, upgraded, promoted, and otherwise treated during employment without regard to race, creed, color, or national origin." 41 CFR § 1–12.805–5(a). A contractor's affirmative action program and the results it produces are evaluated as part of the compliance review activities. 41 CFR § 1–12.-810(c). Since failure to comply with these requirements, as revealed in a compliance review or pursuant to a complaint, can result in the cancellation, termination, or suspension of the contract, or in debarment of the prime contractor from receiving future contracts with the government, the incentive to set the goals to be achieved in the affirmative action plans low already exists so as to ensure that the contract will not be lost because of a later inability to meet those requirements.

Finally, in addition to the contracting requirements themselves, an incentive to set lower affirmative action goals is also present because of the use of these plans in litigation. Compliance with affirmative action plans is regularly considered by courts as evidence of a defendant corporation's attention to a problem or as an affirmative defense to a particular claim of discrimination. *See United Steel Workers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Sisco v. J.S. Alberici Construction Co.,* 655 F.2d 146 (8th Cir.1981). Thus, to the extent that a decrease in voluntary compliance is asserted by the defendant as a result of disclosure of affirmative action plans and EEO–1 reports, the court concludes that other independent factors surrounding the production of these reports already provide the incentive to a contractor, if it were so inclined, to decrease the frankness of the evaluative portion of the reports made to the federal government. Therefore, it appears that the element of confidentiality urged by the defendants is not necessary to assure the continued status of the relationship presently existing between the federal procurement agencies and the parties contracting with the government.

Moreover, the assumption that critical self analysis occurs when the reports of equal employment opportunity are made by employers is speculative. Unlike the peer review cases, such as *Bredice,* in which the critical self analysis privilege was first recognized, the analysis found in the reports at issue here are provided by an employer critiquing itself, whereas in a peer review situation, independent practitioners are critiquing the actions of a fellow professional. The potential for frank criticism is, thus, more likely in the *Bredice* situation than in the situation present in the case *sub judice.*

The third factor recognized by Wigmore is not a matter of dispute in this case.

■ The final factor, identified by Wigmore and listed by the courts in discussing this particular privilege, is whether the injury that would inure to the relationship between the employer and the government by the disclosure of the communication would be greater than the benefit that would result from requiring disclosure. On

balance, this court concludes that the plaintiff should be permitted access to these documents, the affirmative action plans and the EEO–1 reports, including the self evaluative portions, to ascertain whether they contain information helpful to his claim of employment discrimination. These reports could contain potentially useful information of intent and motivation. As the defendant corporate authors of these types of reports may use the reports to demonstrate positive motivation, so should the plaintiffs be allowed access to those reports to determine whether proof of any elements of their cause of action can be aided by that information. The need for all evidence to ascertain the intent of the parties, particularly in employment discrimination cases where proof of intent is so vital and yet so difficult to obtain, significantly overweighs any purported decrease in the quality of the reports presented to the federal government.

Accordingly, it is this 3rd day of January, 1984, by the United States District Court for the District of Maryland, ORDERED:

1. That the Motion to Compel filed by the plaintiff be, and the same is hereby, GRANTED in part and held in abeyance in part as set forth in the body of this Order.

2. That the defendants are permitted fifteen (15) days from the date of this Order to supplement the record to supply a factual basis in evidentiary form for their assertions reviewed in Part I of this Order.

3. That the defendants are hereby instructed to produce the documents requested in Request Nos. 13 & 14 within fifteen (15) days of the date of this Order. Should the defendants wish to limit disclosure of this material to those persons and for those purposes necessary for this litigation only, they will submit the appropriate protective order on the same date.

4. That the following scheduling Order is hereby entered in this case:

| | | |
|---|---|---|
| Interrogatories and Requests for Admissions | ––––– | January 9, 1984 |
| Discovery completed by | ––––– | February 13, 1984 |
| Motions for Summary Judgment and Class Certification | ––––– | February 24, 1984 |
| If motions are filed a hearing will be held on | ––––– | Friday, March 30, 1984, at 11:00 a.m. |
| Pre-Trial Conference | ––––– | Wednesday, April 25, 1984, at 4:30 p.m. |
| Trial (jury) | ––––– | Monday, May 21, 1984, at 10:00 a.m. (9:30 a.m. voir dire) |