Connie J. THARP, Plaintiff,

v.

**SIVYER STEEL CORPORATION, Defendant.**

No. 3–92–CV–10146.

United States District Court, S.D. Iowa, Davenport Division.

June 4, 1993.

Dorothy O'Brien of Noyes, O'Brien, Gosma & Brooke, Davenport, IA, for plaintiff.

J. Stephen Poor and Marcia A. Mahoney, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL

BENNETT, United States Magistrate Judge.

This litigation raises the substantial and nettlesome question of whether an employer in a private employment discrimination lawsuit may shield from disclosure documents prepared by the employer in compliance with federal equal employment opportunity laws by asserting a "self-critical analysis" privilege. While many federal courts have concluded the "self-critical analysis" privilege applies in the employment discrimination context, this court believes the emerging and better reasoned view compels rejection of the "self-critical analysis" privilege in this context. The chance that the "self-critical analysis" privilege might decrease employers' candor in evaluating their employment practices and in communicating this information to governmental agencies is far too remote to undermine the goal of equal employment opportunity. Thus, the policy underlying the "self-critical analysis" privilege does not overcome the basic presumption that the legal system and society are best served by making "a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." *United States v. Procter & Gamble*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958).

## I. INTRODUCTION AND BACKGROUND

Connie J. Tharp, a former salaried employee of Sivyer Steel Corporation ("Sivyer"), alleges in her complaint that Sivyer discriminated against her on the basis of sex and retaliated against her for filing a previous sex discrimination claim, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–17 and the Iowa Civil Rights Act, Iowa Code § 601A (1991).[1] In her motion to compel filed April 16, 1993, Tharp seeks, *inter alia*, copies of the following five portions of Sivyer's affirmative action plans: "work force analysis," "job group analysis," "statement of goals," "prior year affirmative action results" and "identification of problem areas and development of action-oriented programs to eliminate problems." Sivyer has resisted producing these parts of its affirmative action plan on the ground that the materials are protected from disclosure by the "self-critical analysis" privilege. On May 14, 1993, the court ordered Sivyer to produce its affirmative action plans to the court for *in camera* inspection. Those documents have now been produced and the court has inspected them. The parties have filed briefs on the question of the applicability of the "self-critical analysis" privilege and the matter is now fully submitted.

## II. ANALYSIS

### A. Privileges Under the Federal Rules

In Tharp's request for production of documents, request number eleven, she seeks disclosure of Sivyer's complete affirmative action plans for the years 1990, 1991, and 1992.[2] Sivyer only objects to the production of the "work force analysis," "job group analysis," "statement of goals," "prior year affirmative action results" and "identification of problem areas and development of action-oriented programs to eliminate problems," portions of its affirmative action plans on the grounds that such documents are protected by the "self-critical analysis" privilege.

---

1. The Iowa Civil Rights Act, was transferred from Chapter 601A to Chapter 216 in the Iowa Code (1993).

2. Sivyer, as a nonconstruction contractor, is required under 41 C.F.R. ch. 60–2 (1992), to develop a written affirmative action plan and file a copy of that plan with the Office of Federal Contract Compliance Programs.

In delineating the scope of discovery, Federal Rule of Civil Procedure 26(b)(1) provides, in pertinent part, that:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party....

Federal Rule of Evidence 501, in turn, governs evidentiary privilege.[3] Rule 501 does not codify any particular evidentiary privilege, but instead allows for privileges to be determined "in light of reason and experience." Fed.R.Evid. 501. "Its purpose ... was to 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis,' 120 Cong.Rec. 40891 (1974) (statement of Rep. Hungate), and to leave the door open to change. *See also* S.Rep. No. 93–1277, p 11 (1974); H.R.Rep. No. 93–650, p 8 (1973)." *Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980) (footnote omitted).[4]

The Supreme Court has long recognized that privileges "contravene the fundamental principle that 'the public ... has a right to every man's evidence,' " *id.* at 50, 100 S.Ct. at 912 (quoting *United States v. Bryan,* 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950)). Therefore, privileges should not be "lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). As a result, the Court has refused to "create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence....' " *University of Pa. v. Equal Employment Opportunity Comm'n,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990) (quoting *Trammel,* 445 U.S. at 51, 100 S.Ct. at 912).

### B. The "Self–Critical Analysis" Privilege

**(i.) History of the "Self–Critical Analysis" Privilege.** The privilege for "self-critical analysis" was first recognized in *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249, 251 (D.D.C.1970), aff'd, 479 F.2d 920 (D.C.Cir. 1973).[5] In *Bredice,* a plaintiff in a medical

---

**3.** Federal Rule of Evidence 501 provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of the decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

**4.** Congress substituted this mandate for Rule 501 instead of adopting the nine specific privileges drafted by the Judicial Conference Advisory Committee on Rules of Evidence and approved by both the Judicial Conference and the United States Supreme Court. *Trammel,* 445 U.S. at 47, 100 S.Ct. at 910. Indeed, proposed Federal Rule of Evidence 502 specifically delineated an evidentiary privilege for required reports which provided against disclosure.. Proposed Rule 502 stated:

A person, corporation, association, or other organization or entity, either public or private, making a return or report required by law to be made has a privilege to refuse to disclose and to prevent any other person from disclosing the return or report, if the law requiring it so provides. A public officer or agency to whom a return or report is required by law to be made has a privilege to refuse to disclose the return or report if the law requiring it so provides. No privilege exists under this rule in actions involving perjury, false statements, fraud in the return or report, or other failure to comply with the law in question.

Proposed Fed.R.Evid. 502, 56 F.R.D. at 234–35; Judicial Conference of the United States, Proposed Rules of Evidence 13 (Nov.1971).

**5.** Although Sivyer uses the term "self-critical analysis" to describe the asserted privilege at issue in this case, the privilege has been given several different names. *See e.g., Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425 (9th Cir.1992) ("privilege of self-critical analysis"); *In re Burlington N., Inc.,* 679 F.2d 762, 765 (8th Cir.1982) ("self-critical subjective analysis privilege"); *Pagano v. Oroville Hosp.,* 145 F.R.D. 683, 690 (E.D.Cal.1993) ("peer review privilege"); *Hoffman v. United Telecommunications, Inc.,* 117 F.R.D. 440, 442 (D.Kan.1987) ("self-evaluation" privilege); *Witten v. A.H. Smith & Co.,* 100 F.R.D. 446, 449 (D.Md.1984) ("critical self-analysis" privilege), *aff'd* 785 F.2d 306 (4th Cir.1986); *Westmoreland v. CBS,* 97

malpractice case sought to discover hospital "peer review" committee minutes and reports. The court pointed out that ongoing "self-critical analysis" plays a critical role in ensuring the continual improvement of patient care in hospitals. *Id.* at 250. The court further noted that the peer review process was conducted with the expectation that communications would remain confidential, and that confidentiality was necessary in order to protect the unimpeded flow of ideas and advice. *Id.* Because of the "overwhelming public interest" in protecting this process, the court concluded that peer review materials were subject to a qualified privilege. *Id.* at 251.[6]

Shortly after the decision in *Bredice,* the "self-critical analysis" privilege was first recognized in the context of an employment discrimination case in *Banks v. Lockheed–Georgia Co.,* 53 F.R.D. 283, 285 (N.D.Ga. 1971). In *Banks,* the court denied plaintiff's motion for access to internal reports prepared by Lockheed–Georgia employees regarding the company's compliance with Title VII and Executive Order 11246 (now codified in part in 41 C.F.R. § 60–2.1). *Id.* In arriving at its decision, the court reasoned that it would be contrary to public policy to permit access to internal affirmative action materials would "discourage frank self-criticism and evaluation in the development of affirmative action programs of this kind." [7] *Id.* Since the decisions in *Bredice* and *Banks* the "self-critical analysis" privilege has arisen in a wide variety of other types of cases. *See, e.g., Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423 (personal injury lawsuit); *Granger v. National R.R. Passenger Corp.,* 116 F.R.D. 507 (E.D.Pa.1987) (railroad safety); *Roberts v. Carrier Corp.,* 107 F.R.D. 678 (N.D.Ind.1985) (products liability); *In re Crazy Eddie Securities Litigation,* 792 F.Supp. 197 (E.D.N.Y.1992) (securities litigation).[8]

F.R.D. 703 (S.D.N.Y.1983) ("privilege for confidential self-evaluative analysis"); *Rosario v. New York Times Co.,* 84 F.R.D. 626, 631 (S.D.N.Y. 1979) ("self-examination" privilege). For the purposes of this decision, the court shall employ the term self-critical analysis privilege.

**6.** In *University of Pennsylvania,* 493 U.S. 182, 110 S.Ct. 577, the Court did not recognize a common-law privilege against the disclosure of college peer review materials. *Id.* at 188–89, 110 S.Ct. at 581–82. In arriving at this conclusion, the Court noted that Congress considered but "did not see fit to create a privilege for peer review documents." *Id.* at 189–93, 110 S.Ct. at 582–84.

**7.** The *Banks* court's extension of the privilege into the employment area was done without any attempt to analyze the differences between the divergent contexts of hospital peer review committees and equal employment reporting. Instead, the *Banks* court merely concluded, sans discussion, that *Bredice's* analysis of the "self-critical analysis" privilege was equally applicable in the employment context. *See Banks,* 53 F.R.D. at 285. An interesting side note to the *Banks* decision is that the defendant was seeking protection only for its own internal study upon which it had based its governmental reports, and not for the actual government reports, which it had already agreed to disclose. *Id.* Also, it must be noted that the court's conclusion on the privilege issue must be viewed as constituting dicta, since the court had already determined that the requested documents were protected as work product before it addressed the issue of whether the self-critical analysis privilege applied to the documents *Id.* at 284–85. Despite these limitations in the *Banks* decision, courts subsequently followed the *Banks'* decision with very little analysis or discussion. *See generally Rosario,* 84 F.R.D. at 631.

**8.** As the Ninth Circuit Court of Appeals pointed out in *Dowling,* "[t]he Supreme Court and the circuit courts have neither definitively denied the existence of such a privilege, nor accepted it and defined its scope. Rather, when confronted with a claim of the privilege, they have refused on narrow grounds to apply it to the facts before them." *Dowling,* 971 F.2d at 423 n. 1 (citing cases). The Eighth Circuit has had occasion to note the conflict amongst the courts on whether to recognize the "self-critical analysis" privilege, but has not reached the merits of the question of whether it will recognize the privilege. *See In re Burlington N., Inc.,* 679 F.2d at 765. This failure of any of the circuits to recognize the privilege was noted in *Martin v. Potomac Elec. Power Co.,* 1990 WL 158787, at *5, 58 Fair Prac.Cas. (BNA) 355, 360 (D.D.C. May 25, 1990). In *Martin,* the court went on to point out that:

> Two federal Courts of Appeal have decided appeals on the privilege question, but neither issued a published opinion. The fourth circuit affirmed *Witten,* in which the trial court had rejected the privilege. 785 F.2d 306 [46 FEP Cases 1222] (4th Cir.1986). The sixth circuit affirmed in part and reversed in part *Jamison,* in which the trial court had recognized a privilege for subjective materials. 830 F.2d 194 [45 FEP Cases 300] (6th Cir.1987).

**(ii.) The "Self–Critical Analysis" Privilege in the Context of Employment Cases.** Courts have reached contradictory determinations when considering the issue of existence and applicability of a "self-critical analysis" privilege in employment discrimination cases. *See, e.g.,* James F. Flanagan, *Rejecting a General Privilege for Self–Critical Analyses,* 51 Geo.Wash.L.Rev. 551, 553–54 (1983). A fair number of courts have recognized a "self-critical analysis" privilege in the employment context.[9] Other courts, however, have either categorically denied the existence of a "self-critical analysis" privilege or have rejected its application as to particular documents.[10]

Courts which have endorsed the "self-critical analysis" privilege in the employment law context argue that the privilege promotes the public interest in fair employment practices:

> A number of federal Courts of Appeals have decided related issues. *See; e.g., Coates,* 756 F.2d at 552 (court did not decide whether trial judge properly denied plaintiff access to self-evaluative materials since voluntary use by defendant opened door and waived whatever privilege may have existed); *Re Burlington Northern, Inc.,* 679 F.2d 762, 765–68 [29 FEP Cases 565] (8th Cir.1982) (court refused to grant mandamus petition directing the trial judge to vacate order rejecting self-critical analysis privilege); *Emerson Electric Co. v. Schlesinger,* 609 F.2d 898 [21 FEP Cases 475] (8th Cir.1979) (court refused to reach privilege question because, even if privilege existed, it would not apply to facts before court); *Reynolds Metals [v. Rumsfeld,]* 564 F.2d [663,] 667 (court held that regulations place contractor on notice that reports may be disclosed to EEOC).
> *Id.,* 1990 WL 158787, at *5 n. 12, 58 Fair Empl. Prac.Cas. (BNA) at 360 n. 12.

**9.** *See Penk v. Oregon State Bd. of Higher Educ.,* 99 F.R.D. 511, 512 (D.Ore.1983); *Woods v. Coca–Cola Co.,* 35 Fair Empl.Prac.Cas. (BNA) 151, 154–55 (N.D.Ga.1982); *Jamison v. Storer Broadcasting Co.,* 511 F.Supp. 1286, 1296–97 (E.D.Mich.1981), *aff'd in part without opinion and rev'd in part without opinion,* 830 F.2d 194 (6th Cir.1987); *Roberts v. National Detroit Corp.,* 87 F.R.D. 30, 32 (E.D.Mich.1980); *McClain v. Mack Trucks, Inc.,* 85 F.R.D. 53, 58, 59 (E.D.Pa. 1979); *Rosario,* 84 F.R.D. at 631; *Lee v. Keebler Co.,* 25 Fair Empl.Prac.Cas. (BNA) 758, 761 (N.D.Ga.1977); *Stevenson v. General Elec. Co.,* 178 WL 150, 18 Fair Empl.Prac.Cas. (BNA) 746, 747 (S.D.Ohio 1978); *Sanday v. Carnegie–Mellon Univ.,* 1975 WL 294, 12 Fair Empl.Prac.Cas. (BNA) 101, 103 (W.D.Pa.1975).

> [V]oluntary compliance by employers with federal equal employment opportunity laws is essential for implementation of the policy of equal opportunity in employment. In furtherance of voluntary compliance, employers must be encouraged to be candid and forthright in assessing their employment practices and setting goals and timetables for eradicating policies deemed to be discriminatory in operation or effect. If subjective materials constituting "self-critical analysis" are subject to disclosure during discovery, this disclosure would tend to have a "chilling effect" on an employer's voluntary compliance with equal employment opportunity laws.

*Webb v. Westinghouse Elec. Corp.,* 81 F.R.D. 431, 433 (E.D.Pa.1978); *see also O'Connor v. Chrysler Corp.,* 86 F.R.D. 211, 217–18 (D.Mass.1980). Courts implementing the

**10.** *See Etienne v. Mitre Corp.,* 146 F.R.D. 145, 149 (E.D.Va.1993) (rejecting privilege); *Steinle v. Boeing Co.,* No. 90–1377–C, 1992 WL 53752, at *9 (D.Kan. Feb. 4, 1992) (rejecting privilege under facts of case); *West v. Marion Lab., Inc.,* No. 90–0661–CV–W–2, 1991 WL 517230, at *3, 1991 U.S.Dist. LEXIS 18457, at *5 (W.D.Mo. Dec. 12, 1991) (rejecting privilege); *Martin v. Potomac Elec. Power Co.,* 1990 WL 158787, at *4, 58 Fair Empl.Prac.Cas. (BNA) 355, 359 (D.D.C. May 25, 1990); *Siskonen v. Stanadyne, Inc.,* 124 F.R.D. 610, 612 (W.D.Mich.1989) (rejecting privilege); *Capellupo v. FMC Corp.,* 1988 WL 41398, 46 Fair Empl.Prac.Cas. (BNA) 1193, 1198 (D.Minn.1988) (rejecting privilege); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 641 (S.D.N.Y.1987) (rejecting privilege); *Witten v. A.H. Smith & Co.,* 100 F.R.D. 446, 454 (D.Md.1984) (rejecting privilege), *aff'd without opinion,* 785 F.2d 306 (4th Cir.1986); *Brown v. Ford Motor Co.,* 25 Fair Empl.Prac.Cas. (BNA) 711 (N.D.Ga.1979) (rejecting privilege); *Brown v. Ford Motor Co.,* 25 Fair Empl.Prac.Cas. (BNA) 708, 710 (N.D.Ga.1978) (rejecting privilege); *Equal Employment Opportunity Comm. v. ISC Financial Corp.,* 1977 WL 865, 16 Fair Empl.Prac.Cas. (BNA) 174, 179 (W.D.Mo.1977) (rejecting privilege); *Ylla v. Delta Air Lines, Inc.,* 1977 WL 87, 25 Fair Empl.Prac. Cas. (BNA) 754, 758 (N.D.Ga.1977) (rejecting privilege); *See also Myers v. Uniroyal Chem. Co.,* No. 91–6716, 1992 WL 97822, at *1, 1992 U.S.Dist. LEXIS 6472, at *11 (E.D.Pa. May 5, 1992) (holding no privilege under Pennsylvania law); *Zahorik v. Cornell Univ.,* 98 F.R.D. 27, 32–33 (N.D.N.Y.1983) (ordering disclosure subject to protective order), *aff'd* 729 F.2d 85 (2d Cir. 1984); *Ford v. University of Notre Dame,* 1980 WL 224, 29 Fair Empl.Prac.Cas. (BNA) 1710, 1711 (N.D.Ind.1980) (ordering disclosure subject to protective order); *Ligon v. Frito–Lay, Inc.,* 19

"self-critical analysis" privilege in employment cases note that if disclosure of affirmative action plans is required the disclosures will impede employers' compliance with federal equal employment opportunity reporting requirements:

> Even though affirmative action plans are required for all government contractors, the quality of these documents depends to a great extent on the good faith of employers in evaluating their progress and establishing affirmative action goals. If these materials are subject to discovery and can be used by plaintiffs in Title VII suits, employers will not make candid evaluations and will attempt to set goals at minimum levels. Since the government cannot review in detail the massive amount of documents received under the affirmative action program, a decrease in voluntary cooperation could seriously impair the equal employment opportunity policy.

*Dickerson v. United States Steel Corp.*, 1976 WL 596 *3, 14 Fair Empl.Prac.Cas. (BNA) 1448, 1449 (E.D.Pa.1976).[11]

Thus, the arguments asserted by those courts embracing the "self-critical analysis" privilege are not insubstantial. However, weighing against these justifications for shielding "self-critical analysis" materials from disclosure are compelling arguments justifying disclosure and the rejection of the "self-critical analysis" privilege. The following section analyzes the balancing of these competing interests.

***(iii.) Balancing of interests.*** Upon balancing the interests protected by non-disclosure against the possible benefits flowing from disclosure of such documents as affirmative action plans, the court concludes that the "self-critical analysis" privilege should not be recognized in the field of employment discrimination litigation. The court reaches this conclusion based on its assessment of two factors. First, the court's doubts that permitting plaintiffs in employment discrimination actions from discovering such reports as affirmative action plans or other equal employment compliance documents will have a "chilling" affect upon employers' self-evaluations or discourage employers from frank reflection in those reports required by the federal government. *See Etienne*, 146 F.R.D. at 148; *Witten*, 100 F.R.D. at 452–54; *see also O'Connor*, 86 F.R.D. at 217. Second, the court looks to the importance private civil litigation plays as the catalyst for change and enforcement in the area of equal employment opportunity, and the need for discovery of such materials if that litigation is to achieve its purpose. The court will consider each of these factors in turn.

***a. The "chilling" factor.*** On the issue of whether disclosure of affirmative action type materials will have a chilling effect on employer candidacy, it must first be noted that affirmative action plans, such those at issue herein, are not voluntary, but mandated by law. *See* 41 C.F.R. § 60–1.40 (1992) (federal contractors with more than 50 employees and contracts worth more than $50,000 must develop a written affirmative action plan and file written reports on its implementation); 41 C.F.R. § 60–2.11 (setting out required utilization analysis to be performed by employers); *see also Etienne*, 146 F.R.D. at 148; *Witten*, 100 F.R.D. at 452; *O'Connor*, 86 F.R.D. at 217; *Martin*, 1990 WL 158787, at *3, 58 Fair Empl.Prac.Cas. (BNA) at 358. The significance of this fact is that unlike the scenario presented in peer review cases such as *Bredice*, disclosure in employment discrimination cases will not result in diminished equal employment evaluations because employers are mandated to file them.[12] *See*

Fair Empl.Prac.Cas. (BNA) 722, 723 (N.D.Tex. 1978) (ordering discovery subject to protective order).

**11.** Those courts which have adopted application of the privilege, however, have placed four limitations on its application:

> "(1) materials protected have generally been those prepared for mandatory governmental reports; (2) only subjective, evaluative materials have been protected; (3) objective data in

those same reports have not been protected; and (4) in sensitivity to plaintiffs' need for such materials courts have denied discovery only when the policy favoring exclusion has clearly outweighed Plaintiffs' need."

*O'Connor*, 86 F.R.D. at 217 (quoting *Webb*, 81 F.R.D. at 433).

**12.** It should also be noted that, unlike peer review materials, employers can profess no expectation that their employment reports will not be

*Etienne,* 146 F.R.D. at 148; *Witten,* 100 F.R.D. at 453.

A second consideration in the analysis is that disclosure may not restrict employers candidness in reporting because the employers may already be making less than full and fair assessments of their employment practices in their reports. Those courts finding that the "self-critical analysis" privilege exists in employment discrimination cases assume that employers are fully candid in their reporting and that this activity should be further encouraged. However, one must take this supposition on faith. It is, however, a realistic possibility that employers may in fact not be engaging in a full and fair analysis of their equal employment efforts. *See Witten,* 100 F.R.D. at 453; *Martin,* 1990 WL 158787, at *3, 58 Fair Empl.Prac.Cas. (BNA) at 358. Unlike peer reviews, an employer is analyzing its affirmative action results solely to comply with governmental mandated reporting. As a result, companies which are not fully committed to equal employment opportunity may be likely to prepare perfunctory reports which merely satisfy the governmental filing requirements but which are not an honest appraisal of an employer's equal employment opportunity efforts. *See Martin,* 1990 WL 158787, at *3, 58 Fair Empl. Prac.Cas. (BNA) at 358.[13]

On the other hand, if one assumes that employers actually conduct full analyses of its employment actions, significant deterrents to frank analyses are already currently present. *See O'Connor,* 86 F.R.D. at 217; *Witten,* 100 F.R.D. at 453. Those employees responsible for conducting employment analyses may fear that a candid discussion of an employer's actions may result in retribution. *See O'Connor,* 86 F.R.D. at 217. Even if the "self-critical analysis" privilege is recognized and reports are not discoverable, employers still may fear that governmental agencies may employ these reports against them in enforcement actions. A final consideration is that because courts regularly consider compliance with an affirmative action plan as evidence of an employer's attention to a problem or as an affirmative defense to a claim of discrimination, *Witten,* 100 F.R.D. at 453, employers have an incentive to set easily obtainable goals in order to establish evidence of their compliance.[14]

All of these considerations cause the court to conclude that disclosure of these materials will not chill the candor of employers evaluating their fair employment status and progress.

***b. Effect of privilege on civil litigation.*** As courts have recognized, equal employment litigation itself furthers the goal of equal employment opportunity. *See Etienne v. Mitre Corp.,* 146 F.R.D. 145, 148–49 (E.D.Va.1993) (pointing out that private litigants bring actions to "eradicate discriminatory practices of private employers"); *Hardy,* 114 F.R.D. at 640 (noting that a "strong policy favoring private enforcement of the anti-discrimination laws"). Indeed, it is doubtful that the progress made toward equal employment opportunities in this country over the past 30 years would have been possible without the engine of private civil litigation driving enforcement of this nations civil rights laws.

13. Permitting disclosure of an employer's self-critical analyses of its equal employment efforts may actually cause employers to engage in a more honest assessment of its efforts because flaws in those analyses may be brought to light in civil litigation. The sunshine of public scrutiny would thus act as a catalyst to promote, not inhibit, employers to engage in full and candid equal employment assessments.

14. Because employers may use positive reports to prove their good intentions and positive performance, *see Coates v. Johnson & Johnson,* 756 F.2d 524, 552 (7th Cir.1985), it is also fundamentally unfair to deny plaintiffs the use of employment analyses to prove their case. *Witten,* 100 F.R.D. at 454.

revealed. The regulations themselves offer no expectation that the materials will be kept confidential. Rather, the regulations imply that the information may be disclosed in those instances when release of the materials will further equal employment opportunity. *See Witten,* 100 F.R.D. at 452; *Martin v. Potomac Elec. Power Co.,* 1990 WL 158787, at *4, 58 Fair Empl.Prac.Cas. (BNA) at 359–60 ("the reports are not filed with the understanding that they will not be disclosed. Where communications are made without such an understanding, privileges are generally less justified.... The regulations do not promise confidentiality; to the contrary, they imply that if disclosure will further the goal of equal employment opportunity, the information may be disclosed.") (citations omitted).

Because the "self-critical analysis" privilege may impede plaintiffs' access to important relevant documentation needed to press their claims, the "self-critical analysis" privilege must be viewed as restricting the important public interest of enforcement of this nation's equal employment opportunity laws. *See Etienne*, 146 F.R.D. at 149; *Webb*, 81 F.R.D. at 433; *Steinle v. Boeing Co.*, No. 90–1377–C, 1992 WL 53752, at *9 (D.Kan. Feb. 4, 1992). In the context of employment cases, courts must remain cognizant of the possible resulting perils when disclosure is prevented of those documents which may yield crucial evidence regarding an employer's intent and motivation. *See Hardy*, 114 F.R.D. at 640 (" 'In resolving the tensions between the opposed needs of disclosure of confidentiality we are reminded that the discovery rules are to be accorded broad and liberal treatment, particularly where proof of intent is required' ") (quoting *Gray v. Board of Higher Educ.*, 692 F.2d 901, 904 (2d Cir. 1982)).[15] Equal employment opportunity materials may also provide plaintiffs with "critically important information about the extent to which a company recognized its problems, the strength of the company's commitment to equal employment opportunity, the energy it devoted to improving its practices, and its success over time in providing equal employment opportunities." *Martin*, 1990 WL 158787, at *4, 58 Fair Empl.Prac.Cas. (BNA) at 359.[16]

Because disclosure of employers' "self-critical analysis" materials may play a crucial function in civil litigation to eradicate discrimination that exists in the work place, application of the "self-critical analysis" privilege in employment discrimination cases would impede the progress of that litigation and therefore contravene the public interest served by such litigation. *Etienne*, 146 F.R.D. at 149.[17]

Finally, Sivyer has failed to establish that the "self-critical analysis" privilege has any historical basis, has any statutory basis, or is grounded in any state or federal constitutional provision. "Although these are not necessary preconditions to the recognition of a privilege, their absence certainly should carry some weight in the court's analysis. *See University of Pennsylvania*, 493 U.S. at 194, 110 S.Ct. at 585." *Martin*, 1990 WL 158787, at *5, 58 Fair Empl.Prac.Cas. (BNA) at 360.

---

**15.** The need for such documentation as affirmative action plans and EEO–1 reports may be of particular importance in employment discrimination cases. As the court in *Witten* explained:

> These reports could contain potentially useful information of intent and motivation. As the defendant corporate authors of these types of reports may use the reports to demonstrate positive motivation, so should the plaintiffs be allowed access to those reports to determine whether proof of any elements of their cause of action can be aided by that information. The need for all evidence to ascertain the intent of the parties, particularly in employment discrimination cases where proof of intent is so vital and yet so difficult to obtain, significantly outweighs any purported decrease in the quality of the reports presented to the federal government.

*Witten*, 100 F.R.D. at 454.

**16.** The *Martin* court also astutely observed:

> The reports may be useful even if they are not candid: a weakly worded, unimaginative, and unaggressive analysis responding to data showing a significant failure to provide equal employment opportunities may be more damning than a candid evaluation recognizing a company's weaknesses and expressing a serious commitment to overcome those weaknesses.

*Martin*, 1990 WL 158787, at *2, 58 Fair Empl. Cas. (BNA) at 359.

**17.** Courts have questioned any assertion that disclosure of equal employment materials will actually cause a decrease in equal employment opportunity. As the court in *Martin* persuasively argued:

> If more candid self-evaluation and more aggressive affirmative action goals translate into better performance, companies with aggressive plans should not fear disclosure because—by definition, given the assumption that candor translates into better performance—their performances should reflect their efforts. Alternatively, if the candor of a company's self-evaluation and the aggressiveness of its affirmative action goals are unrelated to the company's success in providing equal employment opportunities, society should not care about candor or aggressiveness. Thus, either disclosure will not give companies a disincentive to be candid, or disclosure will give a disincentive to be candid but a decrease in candor will not slow progress toward the goal of equal employment opportunity. In either case, disclosure will not undermine the goal of equal employment opportunity.

*Martin*, 1990 WL 158787, at *4, 58 Fair Empl. Prac.Cas. (BNA) at 359. The court concurs in that assessment.

The court, therefore, concludes for the reasons discussed above that a "self-critical analysis" privilege will not be recognized to shield from disclosure documents prepared by the employer in compliance with federal equal employment opportunity laws. Therefore, Tharp's motion to compel to obtain the "work force analysis," "job group analysis," "statement of goals," "prior year affirmative action results" and "identification of problem areas and development of action-oriented programs to eliminate problems" from Sivyer's 1990, 1991 and 1992 affirmative action plans is granted.

**IT IS SO ORDERED.**