**Eunice O'CONNOR et al., Plaintiffs,**

**v.**

**CHRYSLER CORPORATION, Defendant.**

**Civ. A. No. 77–20–K.**

United States District Court,
D. Massachusetts.

April 11, 1980.

Jinanne S. J. Elder, Suzanne R. Spencer, Elder, Moses and Weiss, Richard L. Neumeier, Parker, Coulter, Daley & White, Boston, Mass., for plaintiffs.

Arnold Manthorne, Warner & Stackpole, Boston, Mass., for defendant.

## MEMORANDUM

KEETON, Judge.

### I.

This case is before the court on plaintiff's motion for production of documents and defendant's objections thereto based on a claim of privilege.

Plaintiff's complaint alleges sex discrimination in employment in violation of 42 U.S.C. § 2000e *et seq.* (Title VII of the 1964 Civil Rights Act, as amended, hereinafter "Title VII"), a conspiracy in violation of 42 U.S.C. § 1985(3), and violations of 29 U.S.C. § 621 *et seq.*, the Age Discrimination Act of 1967. Plaintiff Eunice O'Connor alleges that twice she was denied the opportunity to advance to open positions at Chrysler facilities in eastern Massachusetts that she thought were more responsible and challenging, and that her employment was summarily terminated due to her attempts to advance, her sex, and her age. Plaintiff also seeks certification of this action as a class action, alleging that Chrysler maintains policies and practices with respect to wages, job assignments, promotions and other terms and conditions of employment which unlawfully operate to deny equal opportunities to females because of their sex, and which unlawfully operate to deny equal opportunities to females between the ages of 40 and 65 because of their sex and age.

The current dispute between the parties concerns the discoverability of the self-eval-

uation portions of Chrysler's Affirmative Action Plans (AAPs).[1]

This controversy began almost three years ago with interrogatory number 56 of Plaintiff's First Set of Interrogatories, filed June 6, 1977, Docket number 14.[2] The defendant's answer to interrogatory number 56 stated that an AAP was filed with the Defense Supply Agency in 1974.[3] Plaintiff requested the AAP in request number 11 of Plaintiff's First Request for Production of Documents, filed April 14, 1978, Docket number 53.[4] Chrysler subsequently objected to complying with this request.

This matter and other discovery-related issues have been before a magistrate and another judge of this court, before the case was reassigned when additional judges were appointed to the court in 1979. Oral argument was again heard on January 15, 1980, and additional written submissions have been filed.

## II.

## SUMMARY OF ARGUMENTS

The defendant represents that it has prepared two AAPs which contain information relevant to this cause of action. The first covers the time period from February 1, 1973 to February 1, 1974 and the second contains statistics covering the period from January 1, 1977 to December 31, 1977. Chrysler contends that portions of these plans constitute critical self-evaluation of its progress in the area of equal employ-

ment opportunities. It is asserted that these self-evaluation portions include "hypothetical availability figures" which are negotiated with the federal government and a "postulated utilization analysis" which reflects and further compounds the opinions expressed in the availability figures.

Defendant's argument can be simply stated: Chrysler asserts it is not required to turn over those portions of Chrysler's Affirmative Action Plans which constitute critical self-evaluation of its progress in the area of equal employment opportunities. Chrysler argues that in cases involving private litigants, those courts directly presented with the issue of the discoverability of AAPs have consistently held that there is a strong public policy against disclosure of an employer's self-analyses which far outweighs a plaintiff's need for that information for purposes of presenting his or her case. "Defendant's Supplemental Memorandum in Opposition to Plaintiff's Motion to Compel Production of Chrysler's Affirmative Action Plan," filed January 22, 1980, Docket number 134.

Chrysler has stated that it will make available to the plaintiff the following portions of its AAPs:

(1) Chrysler's policy statement;

(2) Dissemination of policy;

(3) Identification of Affirmative Action program responsibilities;

---

1. Affirmative Action Plans are prepared for the federal government pursuant to the mandates of Executive Order 11246, as amended by Executive Order 11375.

2. "Identify all reports which have been prepared and/or filed with the Office of Federal Contract Compliance (OFCC), the Equal Employment Opportunity Commission or the Wage and Hour Division of the United States Department of Labor between January 1, 1960 and the present date, and all written reports and materials used to prepare such reports.

3. See, "Defendant Chrysler Corporation's Answers and Objections to Plaintiff's First Interrogatories to Defendant." Filed July 26, 1977, Docket number 21.

4. "11. All correspondence, notices, memoranda, forms, plans, reports, communications or other documents from and including January 1, 1965 to the present, in whatever form whether to or between employees and/or agents, and/or advisors of defendant Chrysler Corporation or between them or any one of them and any other individual or entity relating in any way to equal employment opportunity, affirmative action or discrimination in employment on the basis of sex and/or age. Said documents shall include but not be limited to any of same filed with or received from the Equal Employment Opportunities Commission, the U. S. Department of Labor, the Department of Defense, the Office of Federal Contract Compliance and the Massachusetts Commission Against Discrimination."

(4) Work-force analysis statistics on a nationwide basis, listing the number of men and women in each classification (deleting information on race);

(5) Nationwide statistics on hiring and applicant analysis, promotions, transfers and separations (deleting information on race);

(6) Action-oriented programs;

(7) Sex discrimination guidelines;

(8) Community action;

(9) Minorities and women not in the working force;

(10) Internal audit and reporting procedures; and

(11) Various exhibits and letters regarding Chrysler's policies of equal employment opportunities and affirmative action.

Chrysler further argues that the plaintiff has already been provided a wealth of statistical data on Chrysler's work force in the Boston zone and in accordance with the Court's recent rulings, plaintiff will receive statistical data available on a nationwide basis. Chrysler concludes that the plaintiff cannot demonstrate any compelling need for the self-evaluation portions of Chrysler's AAPs.

Plaintiff argues that (1) there is no basis for creating such a public policy privilege at least with respect to AAPs completed pursuant to the mandate of the Executive Orders, (2) Chrysler should, in any event, be compelled to disclose those portions of its AAPs not claimed to be privileged in order for the plaintiff to have some idea of what will be disclosed, and (3) this court should not deny discovery without an *in camera* inspection of the withheld documents with counsel for the plaintiff present. "Plaintiff's Supplemental Memorandum In Support of Her Motion to Compel Production of Chrysler's Affirmative Action Plans," filed January 31, 1980, Docket number 136.

### III.

Title VII was enacted as part of the Civil Rights Act of 1964 and is now codified at 42 U.S.C. § 2000e *et seq.* Title VII makes it unlawful for a private employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.[5] Executive Order No. 11246[6] of September 24, 1965, enunciated a policy of equal employment opportunity in Government employment, employment by Federal contractors and subcontractors and employment under Federally assisted construction contracts regardless of race, creed, color or national origin. Executive Order 11375[7] of October 13, 1967, amended Executive Order 11246, such that the equal employment provided for in E.O. 11246 expressly embraced discrimination on account of sex.[8]

Part II of Executive Order 11246 is concerned with effecting a policy of nondiscrimination in employment of government contractors and subcontractors. Part III requires that there be nondiscrimination provisions in federally assisted construction contracts. Section 201 of the Order delegates to the Secretary of Labor the responsibility for the administration of Parts II and III, mandating that he "shall adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof." Pursuant to that authority, the Secretary has promulgated at 41 CFR § 60 regulations:

> [t]o achieve the aims of parts II, III, and IV of Executive Order 11246 for the promotion and insuring of equal opportunity for all persons, without regard to race, color, religion, sex, or national origin, employed or seeking employment with Government contractors or with contrac-

---

**5.** 42 U.S.C. § 2000e–2(a)(1) (1974).

**6.** 3 CFR, 1964–1965 Comp., p. 339.

**7.** 3 CFR, 1966–1970 Comp., p. 684.

**8.** Part I of Executive Order 11246 and those parts of Executive Order 11375 which applied to Federal employment were superseded by Executive Order 11478, 3 CFR, 1966–1970 Comp., p. 803; as amended by Executive Order 11590, 3 CFR, 1971–1975 Comp., p. 558.

tors performing under federally assisted construction contracts.

41 CFR § 60–1.1 (1979).

In essence, the regulations, specifically 41 CFR § 60–1.40(a), require that each contractor who has 50 or more employees and (1) has a contract of $50,000 or more; or (2) has Government bills of lading which in any twelve month period total $50,000 or more; or (3) serves as a depository of Government funds in any amount; or (4) is a financial institution which is an issuing and paying agent for U.S. savings bonds and savings notes in any amount, shall develop a written affirmative action compliance program for each of its establishments. 41 CFR §§ 60–2.10 through 2.26 set forth detailed guidelines to be used by contractors and the Government in developing and judging programs.

The defendant has referred to "hypothetical availability figures" and "postulated utilization analyses" as being part of the self-evaluation portions of the AAP. The court can find no reference in the regulations to the availability figures being "hypothetical" and the utilization analysis being "postulated." 41 CFR § 60–1.40(a) states that: "A necessary prerequisite to the development of a satisfactory affirmative action program is the identification and analysis of problem areas inherent in minority employment and an evaluation of opportunities for utilization of minority group personnel." 41 CFR § 60–2.11 requires the employer to include in the plan a utilization analysis, and details the factors the employer must consider in determining whether minorities are being underutilized.[9]

Although the figures required might be susceptible to some well-based speculation, this, in and of itself, does not appear to be a valid reason for withholding the self-evaluation aspects of Chrysler's AAPs.

The regulations are not entirely clear as to how the "critical self-evaluation" fits within the AAP. There are some regulations which imply that the employer should have an ongoing analysis of its AAP. For example, 41 CFR § 60–2.10 states in part that:

An acceptable affirmative action program must include an analysis of areas within which the contractor is deficient in the utilization of minority groups and women, and further, goals and timetables to which the contractor's good faith efforts must be directed to correct the defi-

---

9. (1) In determining whether minorities are being underutilized in any job group, the contractor will consider at least all of the following factors:

(i) The minority population of the labor area surrounding the facility;

(ii) The size of the minority unemployment force in the labor area surrounding the facility;

(iii) The percentage of the minority work force as compared with the total work force in the immediate labor area;

(iv) The general availability of minorities having requisite skills in the immediate labor area;

(v) The availability of minorities having requisite skills in an area in which the contractor can reasonably recruit;

(vi) The availability of promotable and transferable minorities within the contractor's organization;

(vii) The existence of training institutions capable of training persons in the requisite skills; and

(viii) The degree of training which the contractor is reasonably able to undertake as a means of making all job classes available to minorities.

(2) In determining whether women are being underutilized in any job group, the contractor will consider at least all the following factors:

(i) The size of the female unemployment force in the labor area surrounding the facility;

(ii) The percentage of the female workforce as compared with the total workforce in the immediate labor area;

(iii) The general availability of women having requisite skills in the immediate labor area;

(iv) The availability of women having requisite skills in an area in which the contractor can reasonably recruit;

(v) The availability of women seeking employment in the labor or recruitment area of the contractor;

(vi) The availability of promotable and transferable female employees within the contractor's organization;

(vii) The existence of training institutions capable of training persons in the requisite skills; and

(viii) The degree of training which the contractor is reasonably able to undertake as a means of making all job classes available to women.

41 CFR § 60–2.11 (1979).

ciencies and, thus to achieve prompt and full utilization of minorities and women, at all levels and in all segments of its work force where deficiencies exist.

41 CFR § 60–2.12(a) states in part:

The goals and timetables developed by the contractor should be attainable *in terms of the contractor's analysis of its deficiencies* and its entire affirmative action program. (Emphasis added.)

41 CFR § 60–2.13 states in part:

Effective affirmative action programs shall contain, but not necessarily be limited to, the following ingredients:

*     *     *     *     *     *

(g) Design and implementation of internal audit and reporting systems to measure effectiveness of the total program.

See also 41 CFR §§ 60–2.23 and 60–2.24(d)(3).

The key regulation appears to be 41 CFR § 60–2.25, which sets forth in greater detail the specifics of the internal audit and reporting systems mentioned in 41 CFR § 60–2.13(g):

§ 60–2.25 Internal audit and reporting systems.

(a) The contractor should monitor records of referrals, placements, transfers, promotions and terminations at all levels to insure nondiscriminatory policy is carried out.

(b) The contractor should require formal reports from unit managers on a schedule basis as to degree to which corporate or unit goals are attained and timetables met.

(c) The contractor should review report results with all levels of management.

(d) The contractor should advise top management of program effectiveness, and submit recommendations to improve unsatisfactory performance.

The authorities are divided on whether these self-evaluative portions of AAPs are discoverable. The cases protecting the results of the internal audits have formulated a qualified privilege based on a public policy of fostering frank self-evaluations. That is, the public interest of encouraging candid self-evaluation leads the courts to restrict discovery of the reports resulting from such investigations.[10]

These cases have identified three factors which weigh against disclosure: (1) the materials were prepared in anticipation of litigation and so are work product; (2) disclosure would inhibit and discourage employers from making frank evaluations of their companies; and (3) disclosure would violate the confidentiality important in obtaining frank evaluations by employers in these reports, thus discouraging candor in future reports.

Other courts have declined to recognize a privilege.[11]

Plaintiff relies heavily on *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169 (1st Cir. 1978) *vacated and remanded,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) *on remand* 604 F.2d 106 (1st Cir. 1979). There, in addition to statistical evidence from which sex discrimination could be inferred, Dr. Sweeney centered an important part of her case on the ineffectiveness of Keene's affirmative action effort. Although a faculty committee drafted an AAP in 1973, no plan was officially adopted until 1976. The plan current at the time of trial, in the form presented

---

**10.** *Banks v. Lockheed,* 53 F.R.D. 283 (N.D.Ga. 1971); *Rodgers v. U. S. Steel,* 11 E.P.D. ¶ 10,-666 (W.D.Pa.1975); *Sanday v. Carnegie-Mellon University,* 11 E.P.D. ¶ 10,659 (W.D.Pa.1975); *Dickerson v. U. S. Steel,* 12 E.P.D. ¶ 11,095 (E.D.Pa.1976); *Stevenson v. General Electric Co.,* 18 E.P.D. ¶ 8777 (S.D.Ohio 1978); *Lyburtus v. Chrysler Corp.,* No. C 76–486 (N.D.Ohio, August 29, 1978). *See also,* 4 Moore's Federal Practice ¶ 26.60[3]; "Civil Procedure: Self-Evaluative Reports—A Qualified Privilege in Discovery?" 57 Minn.L.Rev. 807 (1975); Fed.

R.Civ.P. 26(b)(1) (parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action).

**11.** *Thompson v. Sun Oil Co.,* 523 F.2d 647 (8th Cir. 1975); *Ylla v. Delta Air Lines, Inc.,* 18 E.P.D. ¶ 8937 (N.D.Ga.1977); *EEOC v. ISC Financial Corp.,* 16 F.E.P. Cases 174 (W.D.Mo. 1977); *Ligon v. Frito-Lay, Inc.,* 19 F.E.P. Cases 722 (N.D.Texas 1978).

to the district court, did not address the questions of salary and promotion. Also, there was testimony that the person who nominally served as affirmative action coordinator did virtually nothing to advance the rights of women on the Keene campus. 569 F.2d at 179.

Plaintiff asserts the case stands clearly for the proposition that AAPs are discoverable in this circuit. The assertion is misplaced. The above portion of *Sweeney* means that AAPs are admissible, and their ineffectiveness is accorded considerable weight, but the circumstances regarding their discoverability is not illuminated in *Sweeney*. The AAP may have been voluntarily turned over to Sweeney, as Chrysler asserts it was.

*Webb v. Westinghouse Electric Corp.*, 81 F.R.D. 431 (E.D.Pa.1978) is a well reasoned opinion which attempts to establish some guidelines for determining the circumstances which would justify shielding from discovery items constituting "self-critical analysis." The court noted that, carried to its logical extreme, such a privilege would foreclose discovery of material which might be most strongly probative of discriminatory intent.

The court noted that there were strong countervailing policies existing in this area; that on the one hand:

> If subjective materials constituting 'self-critical analysis' are subject to disclosure during discovery, this disclosure would tend to have a 'chilling effect' on employers' voluntary compliance with equal employment opportunity laws. On the other hand, federal equal employment opportunity laws manifest a strong policy in favor of eradicating all vestiges of employment discrimination due to race, sex, or national origin. In furtherance of this policy, plaintiffs must be permitted to obtain information sufficient to enable them to prove employment discrimination where such discrimination exists. To the extent that the defense of "self-critical analysis" conflicts with a plaintiff's ability to gather information necessary to prove his or her case, the recognition of

such a defense hampers the enforcement of federal equal employment laws.

81 F.R.D. at 433.

After reviewing the relevant case law, the court indicated "potential guideposts" for application of the "self-critical analysis" defense: (1) materials protected have generally been those prepared for mandatory governmental reports; (2) only subjective, evaluative materials have been protected; (3) objective data in those same reports have not been protected; and (4) in sensitivity to plaintiffs' need for such materials, courts have denied discovery only where the policy favoring exclusion has clearly outweighed plaintiffs' need. 81 F.R.D. at 434.

The underlying question is should the privilege continue to be recognized, *i. e.*, will the policy of equal employment opportunity be better served by confidentiality in critical self-evaluation or by disclosure of material which might be most strongly probative of discriminatory intent? There is reason to believe that subjecting the evaluative conclusions contained in AAPs to discovery would not necessarily greatly deter future self-evaluations or substantially reduce their thoroughness. First, since the evaluations in these cases were not entirely voluntary, they will occur even if the threat of discovery is present. Second, in some cases there may be significant deterrents to candid self-evaluation, even absent the possibility of discovery. For example, sanctions against employees are often a possibility when self-evaluative investigations are undertaken. An employee's interest in protecting himself and his fellow employees from discipline is likely to be at least as great as his interest in protecting his employer from suit. Thus, the additional deterrence of investigation occasioned by the possibility of discovery may be minute.

The above limitations do not, however, significantly detract from the reasoning of those courts which have recognized the privilege. A lack of confidentiality almost inevitably will result in some cramping of the investigative process, simply because the incentives for any institution to engage in self-evaluative investigation pale consid-

erably with the knowledge that the results may be used against it.

## IV.

■ The central problem is a clash between highly-valued interests (1) in disclosure that will contribute to full and fair determination of all facts relevant to the plaintiff's claims and (2) in confidentiality both to assure fairness to persons who have been required by law to engage in self-evaluation to promote the public interest in fair employment practices and to make the self-evaluation process more effective by creating an effective incentive structure for candid and unconstrained self-evaluation. In this context neither an unqualified requirement of disclosure nor an unqualified privilege of nondisclosure of self-evaluation seems justified. In the present case, the court will require disclosure subject to the qualifications and conditions stated in Guidelines A–C, stated in the attached order.

Guideline A requires disclosure of statements of fact, including data compilations. Guideline B permits nondisclosure of recitations that (1) are only evaluations of facts elsewhere disclosed and (2) were formulated in response to the governmentally imposed requirement of critical self-evaluation. As to recitations combining statements of fact with critical self-evaluation, Guideline C imposes on the defendant the burden of preparing and disclosing a substitute statement that includes all of the express or implied recitations of fact, while omitting part or all of the self-evaluative statements.

■ Since this is a non-jury case, the court's examination *in camera* of portions of documents to determine whether they must be disclosed under these guidelines may later be an impediment to fair and impartial factfinding. Were it not for the resulting increase in commitment of scarce judicial resources (with potential implications of unfairness to other litigants whose cases are awaiting the court's attention), it would be preferable that the *in camera* examination be done by a hearing officer, judge or magistrate, other than the judge who is to try the case. In the present instance, however, the contentiousness characterizing previous proceedings in this case, noted of record by the judge before whom this case was pending before the 1979 reassignment of cases, indicates a high probability that substantial additional judicial time would necessarily be devoted to the case if responsibility for the *in camera* hearing and for the trial were separated. In these circumstances, the judge to whom the case is assigned for trial will also conduct any *in camera* inspection that may be required. With the objective of avoiding any needless impediment to fair and impartial factfinding by disclosure to the court of privileged matter that the court must later put aside and not consider as factfinder, and with the further objective of avoiding needless use of the additional time of counsel and the court that would be required for the court to examine all deleted material in the presence of counsel as requested by plaintiff's counsel, the court will first examine selected samples, in accordance with the procedure prescribed in the attached order, with the purpose of examining only as much of the deleted material as the court deems essential to reasonable assurance that the stated guidelines have been understood and correctly applied.

A protective order will be entered prohibiting disclosure to any third party, without prior order of this court, of any matter required to be disclosed in accordance with this memorandum and the accompanying order.

## ORDER

### I.

Within 30 days after the entry of this order, defendant shall serve on plaintiff and file with the clerk a copy of each document production of which has been demanded, with such deletions as defendant's counsel represents to the court that defendant has a good faith basis for deleting consistently with the following guidelines:

### II.

A. Defendant shall make available to the plaintiff the following portions of its AAPs:

(1) Chrysler's policy statement;

(2) Dissemination of policy;

(3) Identification of Affirmative Action program responsibilities;

(4) Work-force analysis statistics on a nationwide basis, listing the number of men and women in each classification (deleting information on race);

(5) Nationwide statistics on hiring and applicant analysis, promotions, transfers and separations (deleting information on race);

(6) Action-oriented programs;

(7) Sex discrimination guidelines;

(8) Community action;

(9) Minorities and women not in the working force;

(10) Internal audit and reporting procedures;

(11) Various exhibits and letters regarding Chrysler's policies of equal employment opportunities and affirmative action;

(12) All other recitations of fact, including data compilations on a nationwide basis (deleting information on race).

B. Recitations that are only evaluations of facts elsewhere disclosed in the report need not be disclosed if they were formulated in response to the requirement of critical self-evaluation.

C. Statements that are combinations of matters described in guideline A and matters described in guideline B must be disclosed unless the defendant assumes the burden of preparing and disclosing a substitute statement that includes all of the express or implied recitations of fact, while omitting part or all of the self-evaluative statements.

The copy of each document delivered shall indicate each point at which any matter has been deleted or substituted, as follows:

(1) *Type (1) Deletions.* Three asterisks (\*\*\*) will be used to indicate each deletion with respect to which defendant's counsel also represents to the court that the application of the guidelines stated in the court's memorandum produces no reasonably debatable issue.

(2) *Type (2) Deletions.* Six asterisks (\*\*\*\*\*\*) will be used to indicate each deletion with respect to which defendant's counsel does not make the representation of non-debatability referred to in paragraph (1).

(3) *Substitutions.* If defendant contends that matter not required to be disclosed under the guidelines is inextricably interwoven with matter required to be disclosed, defendant must either disclose or else undertake the burden of preparing a substitute statement in lieu of the undisclosed material. Such a substitute statement must fully and fairly disclose all of the matter required to be disclosed but, to the extent it is possible to do so while disclosing all matter otherwise required to be disclosed, may omit any matter not otherwise required to be disclosed. The substitute passage shall be immediately preceded and immediately followed by three asterisks (\*\*\*) if counsel makes to the court the representation of non-debatability required for a Type (1) deletion and six asterisks (\*\*\*\*\*\*) if counsel does not make that representation.

(4) Defendant's counsel will be prepared to produce in court a complete copy of each document in question, which includes all matter deleted from the copy served upon plaintiff's counsel and filed with the clerk. This complete copy will be retained in the custody of defendant's counsel pending a hearing in open court at which time the court may examine some or all of the deleted materials to determine whether in the court's view counsel's deletions have been consistent with the court's guidelines. The court will first examine deletions selected by the court, by opposing counsel, or at random, with the purpose of examining only as much of the deleted material as the court deems essential to reasonable assurance that the stated guidelines have been understood and correctly applied.

(5) If the court determines in examining selected samples that deleted material should have been disclosed, the court will order immediate disclosure of that material

and may also enter such other order as is appropriate. Absent such a determination, the deleted material will not be disclosed and the complete document, containing all deleted material, will be returned to defendant's counsel, who will retain custody in order to be able to produce the document again upon order of this court or of an appellate court.

### III.

The plaintiff and her attorneys shall not disclose to any third party, without prior order of this court, any of the matter required to be disclosed in accordance with this order and the accompanying memorandum.

### IV.

A hearing will be held at 2:00 P.M. on May 23, 1980 for the purpose of:

(1) Reviewing, under the foregoing guidelines, defendant's compliance with the discovery order filed this day;

(2) Oral argument on defendant's motion for summary judgment;

(3) Consideration of motions related to defendant's motion for summary judgment.