CULINARY FOODS, INC., and Soledad Sagun, as Administrator of the Estate of Remigio Sagun, Deceased, Plaintiffs,

v.

RAYCHEM CORPORATION, Defendant.

No. 92 C 8152.

United States District Court, N.D. Illinois, E.D.

Aug. 10, 1993.

William F. DeYoung, Burke, Bosselman & Weaver, Henry R. Daar, Gary Kostow, Peter E. Kanaris, Steven B. Fisher, Lawrence David Mason, Suanne P. Hirschhaut, Kostow & Daar, Chicago, IL, for plaintiffs.

Gilbert W. Gordon, Thomas G. Oddo, Marks, Marks & Kaplan, Peter C. John, William Joseph Kunkle, Jr., James Terrance

Hultquist, Matthew J. Gehringer, Mary E. Gootjes, Pope & John, Ltd., Chicago, IL, for defendant.

## MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court is the motion of plaintiffs Culinary Foods, Inc, and Soledad Sagun, as administrator of the estate of Remigio Sagun, for a protective order covering items discovered and yet to be discovered from defendant Raychem Corporation.

### I. BACKGROUND

This case arises out of the January 11, 1992 fire which occurred at Culinary Foods, Inc, located at 1240–46 W. George St. in Chicago, Illinois. Culinary Foods asserts that the fire was the result of certain Raychem products which were installed at the location and asserts product liabilities claims against Raychem. Specifically, plaintiffs assert that "FreezGard," one of Raychem's self-regulating pipe heating cable products, was unreasonably dangerous and defective and was the cause of the January 11, 1992 fire. Furthermore, plaintiffs seek punitive damages from defendant claiming that defendant was fully aware of the dangers and defects in its self-regulating heat cable products yet continued to manufacture and market the products.

The motion currently before the court is somewhat unusual in that Culinary is seeking a protective order for materials which they seek to discover from Raychem. We perceive that Culinary's unusual request comes from its view of Raychem's past litigation strategies in other similar cases in which Raychem would file a motion for a rather broad protective order; Culinary thus files its current motion with the court thereby forcing Raychem to file a response to justify its position. Culinary asserts that their motion for a protective order will streamline the litigation. Raychem responds with its own version of an appropriate protective order.

### II. ANALYSIS

▇▇▇ The law applicable to protective orders is found in Federal Rule of Civil Procedure 26(c)(7) which provides: "for good cause shown ... the court may make any order ... that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." In order to establish that information should be subject to a protective order, the party seeking protection bears the burden of establishing: (1) that the information is in fact a trade secret or confidential commercial information and (2) that there is good cause to protect the information. *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir.1986). The requirement of good cause is based upon a fundamental premise that "pre-trial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings." *Wilk v. American Medical Association*, 635 F.2d 1295, 1299 (7th Cir. 1980) citing *American Telephone & Telegraph Co. v. Grady*, 594 F.2d 594, 596 (7th Cir.1978), cert. denied, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979). Thus, purported trade secrets and other confidential commercial information are not automatically protected from disclosure, good cause must also be established. *United States v. International Business Machines Corp.*, 67 F.R.D. 40, 42, n. 1 (S.D.N.Y.1975). Courts have imposed a variety of language as to what satisfies the requirements of good cause.[1] However, once the burden of establishing good cause is met, the burden shifts to the party seeking discovery to show why the court should allow dissemination of the

---

1. See e.g. whether disclosure "will work a clearly defined and very serious injury." *United States v. International Business Machines Corp.*, 67 F.R.D. at 46; "broad allegations of harm unsubstantiated by specific examples of articulated reasoning, do not satisfy the Rule 26(c) test." *Cipollone v. Liggett Group, Inc.*, 785 F.2d at 1121; but see "we think, however, that hard and fast rules in this area are inappropriate. Frequently the injury that would flow from the disclosure is patent, either from consideration of the documents alone or against the court's understanding of the background facts. The court's common sense is a helpful guide." *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, 529 F.Supp. 866, 891 (E.D.Pa.1981).

materials. *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 545 (N.D.Ind.1991).

With this in mind, Culinary acknowledges that they intend to discover confidential information and agrees that Raychem has certain information which should be subject to a protective order. Culinary admits and contends that, "all information, with the exception of Raychem's knowledge of the dangers associated with the use of its self-regulating pipe heating cables and what Raychem did and did not do in light of that knowledge, is entitled to Rule 26(c) protection, thereby precluding publication, dissemination and/or use outside this litigation." (Culinary's Brief in Support of Protective Order, p. 7). We agree in part and disagree in part with this general statement.

■ First, although at this juncture we make no finding as to whether Raychem's products are dangerous and whether Raychem knew of the dangers and either failed to take action or attempted to conceal the information, we agree that such information, if found, is not entitled to Rule 26(c) protection. *Cipollone v. Liggett Group, Inc.*, 106 F.R.D. 573, 576 (D.N.J.1985), rev'd on other grounds, 785 F.2d 1108 (3rd Cir.1986). A claim that public disclosure of information will be harmful to a defendant's reputation is not "good cause" for a protective order. *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. at 546. Although the information regarding the hazards of products and the corporation's knowledge of the information may be embarrassing and incriminating, this alone is insufficient to bar public disclosure. *Cipollone v. Liggett*, 106 F.R.D. at 576–77. Furthermore, where trade secrets are not at issue, common sense would indicate that the greater a corporation's motivations for secrecy, the greater the public's need to know. *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir.1983). In addition, we agree with the district court in its reconsideration of *Cipollone*, in which the court states that although the information will certainly embarrass Raychem, "[i]t is inconceivable to this court that under such circumstances the public interest is not a vital factor to be considered in determining, whether to further conceal that information and

whether a court should be a party to that concealment." 113 F.R.D. 86, 87 (D.N.J. 1986). Where products are indeed hazardous, information concerning the dangers of the products and the corporations lack of action to prevent the dangers or its attempt to conceal the dangers should not be subject to protection under Rule 26(c).

■ However, we do not agree that information concerning what Raychem did do in light of the knowledge of the danger of its products is necessarily outside the realm of Rule 26(c) protection. We do not read the *Cipollone* cases so broadly as to include information of what a corporation did in light of the dangers of its products. *Cipollone* does not hold that valiant attempts to correct hazards must also be disclosed. *Cipollone* states "[d]efendants continue to be entitled to protection from the disclosure of matters which are truly secret, where disclosure thereof will affect the operation of their business, but not their potential liability. Formulae, marketing strategy, and other matters whose disclosure would affect defendants with their respective competitors or in conjunction with the day-to-day operation of their business are entitled to protection. But their part, if any, in concealing or misrepresenting information regarding the [dangers of its products] is not entitled to such protection." 106 F.R.D. at 577. Thus, where Raychem is able to show good cause, we find that information of what Raychem did in order to correct the dangers in its products is subject to protection under Rule 26(c).

Nevertheless, this is not a completely accurate characterization of the issues before the court. Culinary has submitted its version of a protective order which it believes will protect all Raychem information which is entitled to protection. However, Raychem has also submitted its proposal for a proper protective order. Although the parties have had substantial agreement on the form of the protective order, there are a number of points of disagreement between the parties. Thus, while this Court agrees with Culinary's assertions regarding dissemination of Raychem's knowledge of its hazardous products and failure to act or attempts to conceal that knowledge, this Court is not asked to "paint

with a broad brush." The dispute concerns specific language in the proposed protective orders. The language in the proposed protective orders to which both parties agree is adopted by this Court and the disputed language is dealt with below. We deal with each of the disputes separately.

A. *Information Obtained from Nonparties With Whom Raychem Has a Reasonable Expectation of Protection (paragraphs 1 and 3)*

■ Raychem asserts that this protective order should cover trade secret and other confidential information in possession of third parties to whom Raychem has disclosed the information with the expectation of privacy. As an example, Raychem states that in order to receive a UL listing, Raychem must disclose trade secret information to UL with the understanding that UL will not disclose the information to others.[2] The specific reference to UL concerns a previous inspection of UL's files on March 17, 1993 which was conducted by Culinary along with representatives of Raychem. Culinary claims that the issue is moot with respect to the inspections already commenced by Culinary prior to the motions for a protective order. However, the inspections were commenced during the briefing concerning this protective order and Raychem had notified Culinary of its intent to seek protection of the inspection materials until this Court ruled on this protective order.[3] Thus, the protective order does apply to the UL file inspection already commenced.

■ This being so, we find that trade secret and other confidential information disclosed to third parties with the expectation of confidentiality, including the information already obtained from UL, should be protected. Raychem certainly does not waive any right to protection of these trade secrets merely because the information has been filed confidentially with a third party. See

e.g. *Fireman's Fund Insurance Co. v. ECM Motor Co.*, 132 F.R.D. 39 (W.D.Pa.1990). Thus, with respect to this issue, we accept Raychem's proposed language in paragraphs 1 and 3 for inclusion into a proposed protective order.

B. *Information Protected by Orders in Other Litigation (paragraph 3)*

Raychem asserts that information which Culinary has received from litigants in other cases against Raychem has been received in violation of protective orders issued in these other cases.[4] Raychem asserts that this information should be subject to protection in this case and that this Court should not condone violations of protective orders issued by other courts. On the other hand, relying on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), Culinary asserts that protective orders covering information derived outside of the civil discovery process violate the First Amendment. We do not take issue with either of these propositions. However, the determining factor is whether the information has been obtained in pretrial discovery in this case.

■ Where Culinary has solicited information from other parties who are subject to protective orders, we believe that Culinary's solicitation is part of this case's pretrial discovery, and as such, within this Court's power to protect. However, where information was received by Culinary, and Culinary has made no solicitation of the information, the information received is outside the pretrial discovery process and this Court does not have power to prevent Culinary's further dissemination of the information. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17. This Court's power to control discovery does not extend to material discovered in other cases. *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074,

---

2. UL, or Underwriters Laboratories, is an independent product testing laboratory which sets standards and provides "listing" for certain categories of products.

3. In a letter from Raychem's attorney, Matthew Gehringer, to Culinary's attorney, Steven Fisher, Raychem specifically noted that it would seek

appropriate protection from this Court if Culinary intended to disseminate the information prior to this Court's ruling on the protective order.

4. Apparently, a competitor of Raychem has violated protective orders issued in other cases involving Raychem.

1080 (9th Cir.1988). We do not condone violations of protective orders issued by other courts; however, we emphasize that Raychem is left with the remedy of enforcing the protective order issued by the other courts. *Id.* In addition, Raychem can modify the other protective orders to include those individuals who have already received information in violation of those protective orders, i.e. Culinary. Thus, we are reluctant to issue any orders concerning materials which are subject to protective orders issued by other courts.

### C. *The End Results of Raychem's Testing Systems and Procedures (paragraph 4(f) and (h))*

 Raychem asserts that the end results of its testing should be protected. In support of this, Raychem argues that its testing systems, procedures, techniques, and protocols deserve protection because they help Raychem develop and design new and improved products thus allowing Raychem to obtain a significant commercial advantage. Culinary does not dispute the need for confidentiality of this information. However, Raychem believes that revealing the "end results" of product tests will necessarily reveal the systems, tests, and techniques which give them their competitive advantage. We disagree. As noted at the outset, the party seeking protection has the burden of establishing that (1) the information is a trade secret or confidential commercial information and (2) that disclosure would cause a significant identifiable harm. *Cipollone v. Liggett Group, Inc.,* 785 F.2d at 1121. This showing requires specific demonstrations of fact, rather than broad allegations of potential harm. *Id.* Raychem has not met its burden. Raychem's statement that disclosure of the "end results" of testing will necessarily reveal their systems, techniques, and methods of testing is wholly conclusory. Raychem has not demonstrated that the end results of the tests can not be reasonably separated from the systems, tests, and techniques which give them their competitive advantage. Thus, we are inclined not to issue a broad protective order which disallows dissemination of end results of all product testing.

### D. *Product Development Plans (paragraph 4(k))*

 While Culinary agrees that product development plans are subject to a protective order, Culinary asserts that product development plans prior to 1987 are stale and no longer require protection. See e.g. *United States v. International Business Machines Corp.,* 67 F.R.D. at 47–49. "While staleness of information sought to be protected is not an absolute bar to issuance of an order, it is a factor which must be overcome by a specific showing of present harm." *Deford v. Schmid Products Co.,* 120 F.R.D. 648, 654 (D.Md.1987) citing *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 529 F.Supp. at 891. In support of this, Culinary argues that other manufacturers have been manufacturing self-regulating heating cables for years and that Raychem stopped manufacturing FreezGard in the U.S. in 1986. Raychem, on the other hand, states that pre–1987 plans (1) reveal substantial information about current development plans and other business strategy because it takes years to implement the plans and (2) this information reflects current product development efforts because development plans have not dramatically shifted since 1987. We agree with Raychem and find that pre–1987 product plans should be protected. In this case, Culinary asserts that the fire was caused by the hazardous nature of the product FreezGard. Although FreezGard is no longer manufactured in the U.S., several hundred different heating cable products manufactured by Raychem use the same basic technology as FreezGard and depend upon some of the same trade secrets and proprietary information. Thus, we conclude that disclosure of pre–1987 development plans concerning FreezGard will likely reveal information about the current operations of Raychem and is appropriate matter for inclusion in a protective order.

### E. *Raychem's Own Evaluations of Its Products (paragraph 5(b))*

 In paragraph 5 of the Protective Order, Raychem and Culinary have agreed to language which states that the term "confidential" shall not encompass Raychem's "self-critical analysis." However, Raychem

wants to insert language clarifying that the paragraph does not apply to documents protected by an appropriate privilege. Culinary objects stating that no self-critical analysis privilege exists. Apparently, both parties have confused the issues of discovery and protection. First, this language is unnecessary because this Protective Order applies only to documents which must be produced. If a document is in fact privileged, the document is not subject to discovery and therefore need not be protected by a protective order. Second, Culinary admits that they inserted the language in the protective order to force the court to decide the issue of whether or not a self-critical analysis privilege exists. We find, particularly due to the difference in court opinions regarding this issue,[5] that this issue should not be dealt with now in the abstract. We will deal with the issue at the appropriate time, i.e., when a claim of the self-critical analysis privilege is asserted with respect to specific discovery materials.

 As pointed out by Culinary, the justification for the privilege is to protect those persons required by law to engage in self evaluation thereby fostering candid and unconstrained self evaluation. *O'Connor v. Chrysler Corp.*, 86 F.R.D. 211, 218 (D.Mass. 1980). When the privilege has been adopted, the courts have consistently applied these standards:

1. the materials must have been prepared for mandatory government reports,

2. any privilege extends only to subjective, evaluative materials, but not to objective data in the reports,

3. discovery has been denied only where the policy favoring exclusion has clearly outweighed plaintiffs' need.

*Resnick v. American Dental Association*, 95 F.R.D. 372, 374 (N.D.Ill.1982). Cases cited by Culinary from the Northern District of Illinois do not directly accept or reject the privilege. E.g. *Resnick*, 95 F.R.D. at 374 finding that the court need not decide wheth-

er the privilege exists because materials at issue were not government required reports; *Vanek v. The Nutrasweet Co.*, No. 92 C 0115, 1992 WL 133162, 1992 U.S. Dist. LEXIS 8191, (N.D.Ill. June 9, 1992) finding it unnecessary to determine whether the privilege existed because defendant had not satisfied its burden of showing privilege applied; *Vanek v. The Nutrasweet Co.*, No. 92 C 0115, 1992 WL 281355, at *3, 1992 U.S. Dist. LEXIS 15196, at *9 (N.D.Ill. October 7, 1992) stating, "if it is found that portions of the reports are potentially privileged, it will then be determined whether the self-critical analysis privilege should be recognized." The Seventh Circuit has seemingly been presented with the issue in the context of an affirmative action case. In *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985), the Seventh Circuit recognized that the "prevailing view" was that self-critical portions of affirmative action plans are privileged. The court also noted that the bounds of the privilege have not been defined. *Id.* However, again, the Seventh Circuit did not decide whether the privilege existed because its ruling was based on waiver, not the merits of the privilege. *Id.* at 551–552. Thus, based on these cases, it is difficult to determine whether the self-critical analysis has been adopted by the Northern District of Illinois or the Seventh Circuit.

Furthermore, the case which Culinary relies on to establish the proposition that a self-critical analysis privilege does not exist in Illinois is by no means clear on the issue. Culinary cites *The Equal Employment Opportunity Commission, et al. v. Burlington Northern, Inc. et al.*, No. 78 C 269, *sl. op.*, (N.D.Ill. December 10, 1982) for the proposition that Illinois law does not recognize the self-critical analysis privilege. However, we do not agree with Culinary's analysis of this case. First, the action was an employment discrimination allegation brought under Title VII and the Civil Rights Act of 1964. Based upon this, there is no indication that jurisdiction was predicated on diversity nor that the

---

5. District courts have come to different conclusions as to whether the self-critical analysis privilege exists. See e.g. *Banks v. Lockheed–Georgia Co.*, 53 F.R.D. 283 (N.D.Ga.1971), *O'Connor v. Chrysler Corp.*, 86 F.R.D. 211 (D.Mass.1980), and

*Webb v. Westinghouse Electric Corp.*, 81 F.R.D. 431 (E.D.Pa.1978) finding a privilege exists But see *Ligon v. Frito Lay, Inc.*, 82 F.R.D. 42 (N.D.Tex.1978).

court was applying Illinois law. Secondly, the holding of the court was the following: "After careful review of the facts and the parties' submissions, the court finds that a 'self-critical analysis' privilege does not exist to justify defendant's refusal *to submit the documents requested by plaintiffs.*" *Id.* at 1. Our reading of the courts holding indicates only that the self-critical analysis privilege does not apply to the documents requested, not that Illinois law does not recognize the privilege. Furthermore, the court goes on to state, "*If such a privilege exists,* it is not absolute, nor is it inviolate except on waiver by the possessor. Moreover, the inconsistencies in the district court opinions and the Supreme Court's failure to recognize the privilege *put its validity at question.*" *Id.* at 1–2. We do not agree that this language indicates that Illinois law does not recognize the self-critical analysis privilege, especially in light of the previously discussed Northern District and Seventh Circuit cases decided after *Burlington Northern.* What is clear to the court is that this issue should not be decided in the abstract, but should be dealt with at the appropriate time when the privilege is claimed regarding a specific document. At that time, we will determine whether the privilege exists with respect to the specific document and, if necessary, whether the information will be protected from further disclosure.

### F. *Information Concerning Product Design Modifications and Changes (paragraph 5(f))*

██ Culinary contends that this Protective Order should not cover information concerning what Raychem did and did not do in light of its knowledge of the dangers of its products including product design modifications and changes. As discussed earlier, we believe that failure to take action with regard to knowledge of dangers and attempts to conceal such dangers are not subject to protection under Rule 26(c). However, attempts to correct the dangers are subject to Rule

26(c) protection where Raychem is able to meet its burden.

Here, we believe that Raychem has met its burden concerning product design modifications and changes. Raychem has spent a great deal of time and money in developing and modifying its products.[6] Furthermore, Raychem has gone through exhaustive efforts to maintain the confidentiality of this information.[7] We believe the injury to Raychem from disclosure of its product design modification and changes is patent. See *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 529 F.Supp. at 891. Should Raychem's competitors obtain the information concerning product design modification and changes, Raychem would lose its competitive advantage it has obtained from this information. Furthermore, disclosing Raychem's product design modification and changes would decrease Raychem's incentive to invest in safety devices. Raychem's competitors would get free access to information which Raychem has spent a great deal of time and money producing and protecting. Thus, we reject the language proposed by Culinary; the protective order should contain language consistent with the court's stated analysis herein.

### G. *Documents Containing Both Confidential and Nonconfidential Information (paragraph 5)*

██ Raychem, in its proposal for a protective order, expresses concern over disclosure of documents which contain both confidential and nonconfidential material. Raychem asserts that most of its confidential documents contain nonconfidential information and that these documents should not lose protection merely because they contain some nonconfidential materials.

Culinary responds that Raychem's sole responsibility is to designate information which is confidential as such. Raychem should not be able to abuse this process by designating large volumes of documents with a general stamp of "confidential."

---

**6.** Raychem employees have spent approximately five hundred worker-years developing Raychem's line of self-regulating heating cable products.

**7.** Raychem has hired security guards to protect its facilities, required its employees to carry identification passes, restricted access to confidential information, and formulated employee agreements protecting trade secrets.

As the argument develops, both parties express concern over the mechanics of determining what in fact is confidential. Culinary maintains that the materials should be combed through paragraph by paragraph while Raychem maintains that this is overly burdensome in light of the fact that discovery has already led to the production of thousands of pages of documents and will certainly lead to a great deal more. At this juncture, we decline to enter into the realm of the mechanics of distinguishing between confidential and nonconfidential information. However, we emphasize that paragraph 8 of the protective order requires that the confidential designation be made in good faith. Furthermore, paragraph 10 of the protective order gives the parties a remedy which they may use should they desire to challenge the confidential designation. The parties must first meet in good faith to resolve the issue and if resolution between the parties is not possible, the issue should be brought before this court. Should it be necessary for this court to resolve the issue, the burden of proof does not shift. The burden of proving confidentiality remains on the party claiming confidential treatment while the burden of raising the issue shifts to the party challenging such designation. See *Cipollone v. Liggett Group, Inc.*, 785 F.2d at 1121; *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, 529 F.Supp. at 892. Again, this court emphasizes that confidential designations be made in good faith and points to the language already agreed upon between the parties (paragraph 11) addressing potential sanctions imposed for designations not made in good faith.

H. *Use of Confidential Information for Litigation By Other Parties Against Raychem (paragraphs 6, 6(e), 6(f), 14, and 16)*

■ Raychem does not deny that Culinary can distribute nonconfidential information to whomever they choose. However, Raychem requests that this court insert language in the protective order which prevents Culinary from disseminating confidential information to third parties, including attorneys involved in similar actions against Raychem. Culinary disagrees stating that case law is clear on the issue of encouraging sharing of information with other litigants. We agree that case law encourages sharing of nonconfidential information with other litigants, but this does not apply to the sharing of confidential information under a protective order that limits access to certain identified individuals.

■ As stated in *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. at 546, the certainty that the party receiving the discovery will share the information does not alone constitute good cause for a protective order. The desire to share information with other litigants and their attorneys is an appropriate goal under the Federal Rules of Civil Procedure, which are intended "to secure the just, speedy, and inexpensive, determination of every action." *Deford v. Schmid Products Co.*, 120 F.R.D. at 654 citing Federal Rule of Civil Procedure 1. Collaborative use of discovery materials furthers the goals of Rule 1 by eliminating the time and expense of "rediscovery." See *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. at 546 and cases cited therein. An exception to this rule occurs in cases where collateral litigation is commenced solely for the purpose of undermining the limitations on discovery in another proceeding. *Wilk v. American Medical Association*, 635 F.2d at 1299. In this case, Culinary is clearly a bona fide litigant not trying to undermine discovery in other cases.

However, cases cited by Culinary in their briefs dealing with this issue reject protective orders prohibiting dissemination of *all* information. E.g. *Nestle Foods Corp. v. Aetna Casualty and Surety Co.*, 129 F.R.D. 483 (D.N.J.1990) (proposed protective order that *all* discovery material be used only for purposes of this lawsuit); *Cipollone v. Liggett Group, Inc.* 106 F.R.D. at 577 (*all* information shall be used solely for this litigation). We agree with the holding of the court in *Cipollone v. Liggett Group Inc.*, 106 F.R.D. at 585, that an order disallowing dissemination of *all* information oversteps the bounds permitted by Rule 26(c) by limiting flow of information without a showing of any cause whatsoever; the issued protective order covered only *confidential information. Id.* We believe this is proper because Raychem has

established good cause to protect the confidential information. Furthermore, this does not conflict with the holding of *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. at 546, in which the court found that the certainty that the party receiving the discovery will share the information does not alone constitute good cause for a protective order. The instant protective order will cover only confidential information which either Culinary has already agreed is confidential or we have determined to be confidential under the standard of good cause.

Moreover, if Culinary were allowed to disseminate the confidential information, this would unduly raise the risk that Raychem's competitors will obtain access to this confidential information. This also would make enforcement of this protective order overly burdensome to Raychem, should the confidential information be allowed to be disseminated by Culinary. This is evidenced by the fact that third parties have in fact received information in violation of protective orders issued by other courts.[8] Furthermore, we find information received by Culinary in violation of other courts protective orders may not be subject to protection by this court. We hold that confidential information obtained by Culinary in this litigation may not be disseminated to litigants in other cases against Raychem.

I. *Reservation of Right to Seek or Oppose Protection In Open Court (proposed paragraph 7)*

■ Raychem requests that this Court insert a clause reserving to the parties the right to seek or oppose protection of confidential information used in open court. However, this issue is premature. Raychem need not reserve this right at this time in order to raise the issue at trial. It already occupies that right. Thus, we see no need to include any references to a party reserving its right to seek or oppose protection in open court but emphasize that the right will be dealt with accordingly at the appropriate time of trial.

J. *Liability for Breach of Protective Order (paragraph 19)*

■ The last dispute concerns whether the protective order should contain a damage clause. Raychem claims that a damage clause will help deter violations while Culinary claims that the clause is unnecessary. In light of the previous violations of protective orders issued by other courts in cases against Raychem[9], we feel that a damage clause may help to serve a deterrent effect. However, should this protective order be violated for any reason, we will determine the damages at that time. Thus, an appropriate damage clause may be the included protective order.

### III. *CONCLUSION*

For the foregoing reasons, it is hereby ordered that the motions of plaintiffs and the responses of defendants are granted in part and denied in part as stated herein. The parties are to submit a proposed protective order consistent with our rulings. Attached as an Addendum is a suggested format reflecting the parties agreements and those rulings made on the disputed portions of the proposed protective order.

### *ADDENDUM*

1. There is established by the Court a zone of confidentiality into which any party to this litigation may place any non-public information or document produced by any entity or otherwise contemplated in response to discovery processes (e.g. Interrogatories, Requests for Production, Subpoenas, etc.) or arising during the course of any deposition. This Protective Order covers or otherwise pertains to "CONFIDENTIAL" information and material as defined below and has no bearing upon and, thus, places no restrictions or constraints on the publication, dissemination or use of any "nonconfidential" information or material.

2. This zone of confidentiality is for the protection of the information which the party seeking the protection of this order claims to be a trade secret or other "CONFIDEN-

---

**8.** See footnote 4.

**9.** See footnote 4.

TIAL" research, development or commercial information not readily available to the public.

3. This Protective Order covers only documents and/or information requested, obtained or otherwise produced by any person or entity "through the discovery process" in this case or documents or information solicited by either party which are protected by protective orders entered in other cases.

4. The term "CONFIDENTIAL" (so as to afford the party making such designation protection against publication, dissemination and/or use of such information beyond the boundaries set forth in this order) as used herein *SHALL ENCOMPASS*, but shall not be limited to the following:

a. Chemical calculations, physical and chemical compositions of RAYCHEM's heat cable products as well as components thereof, chemical processes and formulations, product specifications and product performance specifications *not* otherwise released to the public including such specifications concerning component parts of such products, and product design formulations;

b. Specifics regarding RAYCHEM's manufacturing operations (i.e. how its heat cable products are physically manufactured, including the equipment used);

c. RAYCHEM's internal marketing strategy;

d. The actual manner (from an engineering and/or technical standpoint) of incorporating, developing, testing, and/or designing potential safety devices or mechanisms (e.g., metal braids, fused plugs, ground fault protection devices, etc.) into RAYCHEM's pipe heating cable products, i.e. information concerning RAYCHEM CORPORATION's experience and "know-how" with respect to making such devices available as a part of its products;

e. Information concerning the technologies and/or processes developed by RAYCHEM CORPORATION in the 1960's and early 1970's and referred to by RAYCHEM CORPORATION as "radiation chemistry" and "conductive polymer" technology;

f. Testing systems, procedures and/or protocol developed by RAYCHEM CORPORATION in order to evaluate its products and the manner in which they perform (e.g., the particular manner and method in which and/or how, logistically, RAYCHEM tests its heat cable products); *as opposed to and, thus, not including* the end results and/or conclusions derived by virtue of such testing;

g. Actual product designs, plans, drawings and specifications *as opposed to and, thus, not including* what a particular pipe heating cable product of RAYCHEM includes or does not include in general terms, i.e., its general make-up and composition, the safety features or devices it has, etc;

h. the actual "techniques" and "procedures" that RAYCHEM has developed for purposes of evaluating its heating cable products and the performance of those products when exposed to a variety of conditions, i.e., how the products are physically tested and/or evaluated *as opposed to and, thus, not including:*

1. the results of such evaluations, and

2. the matters specifically discussed or otherwise addressed immediately prior to, during and subsequent to such evaluation as it relates to product safety, product hazards, failure modes, safety devices or measures to reduce such dangers, National Electric Code changes, product performance, product complaints and the sufficiency and/or adequacy of the warnings and instructions disseminated to the public with its products, etc;

i. Electrical circuitry diagrams, plans, specifications or drawings which detail how, specifically, the product is wired, designed and/or functions *as opposed to and, thus, not including,* how RAYCHEM's heating cable products operate and/or function in general terms;

j. Client, customer, price, distributor, vendor and/or cost lists associated with RAYCHEM's self-regulating heat cable products, including potential client lists;

k. Product development plans past or present;

l. Internal management and/or personnel procedures relating directly to the day-to-day, administerial affairs of RAYCHEM CORPORATION, including budgeting, marketing, accounting in general, fund and/or capital allocation, sales, profit and loss projections and matters of accounting;

m. The overall financial condition and/or well being of RAYCHEM, including financial facts;

n. Performance standards, and;

o. Reports or documents which RAYCHEM is or at any time was specifically required by the government to file or otherwise submit as opposed to such documents which are or were voluntarily made or otherwise furnished.

5. The term "CONFIDENTIAL" (so as to afford the party making such designation protection against publication, dissemination and/or use of such information beyond the boundaries set forth in this order) as used herein *SHALL NOT ENCOMPASS OR OTHERWISE EMBRACE* the following except if such documents or information reveal information described in Paragraph 4:

a. RAYCHEM's knowledge, prior to December 31, 1986, of the propensity or potential, if any, for its pipe heating cables to arc, fault, "arc-fault," ignite, fail, char or otherwise catch on fire, including but not limited to RAYCHEM CORPORATION's knowledge of complaints received because a product arced, faulted, ignited, failed, charred or otherwise caught on fire and knowledge of the phenomenon knows as the "wet wire fire" phenomenon and the "dry wire fire" phenomenon as it relates to self-regulating heat cables;

b. RAYCHEM's negative evaluation of its self-regulating pipe heating cables to the extent only that such analysis and/or evaluation concerns or otherwise relates to knowledge RAYCHEM CORPORATION had, prior to December 31, 1986, with regard to potential failure modes, scenarios where arc or ground faulting may or was known to occur, the risk of fire, charring or burning, safety devices or practices available which would serve to eliminate, reduce or diminish the risk if any of the ignition of fire and the sufficiency of product warnings and instructions as it relates product performance;

c. RAYCHEM's knowledge, prior to December 31, 1986 of available or potential safety devices or practices which could and/or potentially would have eliminated, reduced or otherwise diminished the risk of the ignition of fire, if any, associated with the use and installation of its self-regulating pipe heating cables;

d. RAYCHEM's knowledge, prior to December 31, 1986, of deaths, injuries or damages attributable or claimed to be attributable to the use and installation of self-regulating pipe heating cable;

e. RAYCHEM's knowledge, prior to December 31, 1986, of potential modifications and/or changes to the provisions of the National Electric Code pertaining to pipe heating cables; and

f. RAYCHEM's failure to act with regard to or RAYCHEM's attempts to conceal the knowledge it possessed prior to December 31, 1992 as embraced in subparagraphs 5(a) through 5(e) above.

6. The parties and their attorneys shall use, either directly or indirectly, "CONFIDENTIAL" information or documents solely for the purposes of this litigation and shall not give, show, or otherwise, either directly or indirectly, divulge, publish or disseminate any "CONFIDENTIAL" information (as that term is specifically defined herein above) produced by defendant RAYCHEM CORPORATION in this action, or the substance thereof, or any copies, descriptions, prints, negatives, or summaries thereof and will not use or disclose any information contained therein to any entity, person or the public in general except to those "qualified persons" identified in subparagraphs (a) through (e) below:

a. Counsel of record for the parties herein and attorneys employed by such counsel of record, or by any of the parties, and who assist, supervise or monitor the prosecution or defense of this case;

b. Paralegals, legal assistants, stenographic, clerical and others directly or specially employed by counsel of record in this case;

c. Court reporters and employees of court reporters engaged by counsel for the parties herein to record and transcribe testimony in connection with this case;

d. Experts and consultants, including independent experts and consultants, and employees or clerical assistants of such experts, who are retained, employed or otherwise consulted by counsel for or by the parties herein to assist or otherwise participate in the preparation for and/or trial of this case in addition to any employee of a party required to assist counsel in preparation for trial;

e. Any person from whom testimony is taken or to be taken in this action ("witness"), provided that such a person only be shown copies of material which contains "CONFIDENTIAL" information during his or her testimony or in the actual course of preparation therefor and may not retain any material designated as such.

7. Any and all "qualified persons" above who are given access to "CONFIDENTIAL" information shall be presented with a copy of this order by the attorney making the disclosure and shall agree to abide and, thus, be fully bound by its terms by executing a written confidentiality agreement in the form attached hereto and marked as Exhibit "A."

8. In the first instance, any party may designate a document or information within a document as "CONFIDENTIAL" only upon a good faith belief that the information falls within the scope of "CONFIDENTIAL" information under the Federal Rule of Civil Procedure and the precedents thereto as set out fully in paragraphs 4 and 5 above herein.

9. If an opposing party objects to the other party's "CONFIDENTIAL" designation or marking, such party must, within thirty (30) days of becoming apprised of such designation or marking, state the objection with particularity, thereby advising the party seeking protection of the objection.

10. Upon receipt of any objection to a designation of "CONFIDENTIAL", the parties must meet and confer in good faith to resolve the objection. If such objections cannot be resolved, the party opposing the designation of "CONFIDENTIAL" may raise the issue by Motion with the Court. The party seeking the designation of "CONFIDENTIAL" continues to have the burden of proving that the information for which protection is being sought is indeed "CONFIDENTIAL" and, thus, worthy of being so protected.

11. If any objection to a designation or marking of "CONFIDENTIAL" is sustained or overruled after briefing and/or hearing, sanctions may be imposed upon the party making the designation or objection, if such designation or objection was not made in good faith, including attorney's fees and the reasonable expenses incurred by the parties pursuant to FRCP 26(g).

12. Any information, writing or other material that has been marked or otherwise designated as "CONFIDENTIAL" as set forth herein and which is identified as an Exhibit in connection with testimony given in this litigation, or is used or submitted to the Court in connection with any filing or proceeding in this litigation must be filed under seal with the clerk of the court by the party seeking protection.

13. Once information or material has been marked as "CONFIDENTIAL" as set forth herein, such information or material shall not be disclosed or discussed with anyone except as provided in this order or upon written consent of the party or person making the "CONFIDENTIAL" designation.

14. No party, individual or entity given access to information protected by this Protective Order shall, for himself, herself or itself make more copies of any "CONFIDENTIAL" information or material than are reasonably necessary for the conduct of this litigation. Any party or other person or entity making copies of information subject to this Protective Order shall keep a record of the number of copies made and the particular documents so copied.

15. All "CONFIDENTIAL" information or material shall be returned to the disclosing and/or producing party upon the conclusion of this litigation or at such earlier time as the court may deem proper.

16. Notwithstanding any other provision of this Protective Order, including but not limited to Paragraph 6, no document designated "CONFIDENTIAL" pursuant to and in compliance with this order, nor the substance thereof, shall be disclosed to known current or former employees, principals, owners or agents of competitors of defendant RAYCHEM CORPORATION without first affording RAYCHEM CORPORATION notice and an opportunity to be heard in this Court.

17. Under no circumstances, due to violations of pervious protective orders, shall any "CONFIDENTIAL" information or documents be disclosed to Peter Cooper, owner of G.E.R., Inc.

18. This order shall be binding upon any future party to this litigation.

19. Upon breach of this Protective Order, the breaching party (or parties) shall be jointly and severally liable to the party making the "CONFIDENTIAL" designation for damages to be determined by this Court.

**Exhibit "A": Confidentiality Agreement**

I hereby certify that I have read, reviewed and understand the Protective Order entered in the above-captioned matter and I agree to abide fully and, thus, be bound by its terms and to be bound thereby.

I hereby consent to be subject to the personal jurisdiction of the above-captioned Court with respect to any proceeding related to the Protective Order.

Dated: _____

_____
Signature

It is so ordered this ___ day of _____, 1993.

ENTER: _____

EDWARD A. BOBRICK
U.S. Magistrate Judge